**UNITED STATES of America**

v.

**Dan Edd THOMPSON et al.**

**UNITED STATES of America**

v.

**William Christian BOECKER.**
Crim. Nos. 74–L–14, 74–L–27.

United States District Court,
S. D. Texas,
Laredo Division.
May 13, 1974.

338

Anthony J. P. Farris, U. S. Atty., Houston, Tex., and Daniel V. Alfaro, Asst. U. S. Atty., Laredo, Tex., for plaintiff.

Laird Palmer, Austin, Tex., and Richard E. Haynes, Laredo, Tex., for defendants in Crim. No. 74–L–14.

Knox Jones, McAllen, Tex., for defendant in Crim. No. 74–L–27.

MEMORANDUM AND ORDER

CONNALLY, District Judge.

In each of the above styled actions the defendants were charged with the possession with the intent to distribute large quantities of marihuana. In each the investigation began when the vehicle in which the defendants were riding was stopped by United States Border Patrol officers in or near the city of Hebbronville, Texas. In each the guilt of the defendants is tacitly if not expressly conceded, and the only question presented is as to the admissibility of the contraband recovered by the Border Patrol on these occasions. The facts necessary to establish the government's case are conceded, except with respect to the motion to suppress. Thus, by agreement of all parties the motions to suppress in the two cases were heard together. Much of the evidence is common to the two. Wherein the cases are different, both the government and defense counsel were afforded the opportunity to offer such additional evidence as was desired.

By reason of the decision of the Supreme Court of the United States in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), certain practices followed for many years by the Border Patrol officers in making their arrests of illegal aliens and seizures of narcotics have been called into question. As the practices followed by the Border Patrol in and around Hebbronville, Texas, are unique, at least with respect to this District, these practices were fully explored in the present record, to the end that their validity might be reviewed and determined.

*The Geography*

It will be necessary to examine a road map or Atlas (Government's Exhibit 1) properly to understand the record in this action. This Southern Judicial District of Texas is bounded on the south by the Rio Grande River—and thus shares a common boundary with the Republic of Mexico—for a distance of approximately 250 miles. One traveling from Laredo, Texas (the only city of any size in the upper end of the Rio Grande Valley within this District) to Brownsville, at the southern tip of Texas, would proceed along Highway 81, a major thoroughfare which parallels the Rio Grande; and in many areas is only a few miles from the river. Traveling this route, the traveler would note that for the first 150 miles of the journey, and prior to reaching the vicinity of Mission or McAllen, the area is sparsely settled and devoted almost entirely to ranching. There are few roads, other than those leading through private property, some of which, however, connect with public roads. For the remaining portion of the trip, however, from Mission-McAllen on to Brownsville, within the last 50 miles the area is irrigated and intensely cultivated. This lower portion of the Rio Grande Valley is a prolific producer of citrus fruits, vegetables, melons and produce. It likewise is heavily populated.

A further examination of the highway map will indicate that a traveler wishing to go northward from the Rio Grande Valley would have available three main arterial highways. The most easterly of these, and originating in the Brownsville-Harlingen area and paralleling the Gulf Coast a distance of perhaps 25 to 30 miles to the west thereof, is Highway 77. It leads northward to Kingsville and Corpus Christi, connecting with other highways at its northerly terminus. To protect against the influx of illegal aliens, the Border Patrol maintains a permanent checkpoint near the town of Sarita some 50 to 60 miles north of the Rio Grande River.

The second arterial highway to the north is 281 originating in the McAllen-Edinburg area. This highway parallels Highway 77 for much of its length and is perhaps some 25 miles to the west

thereof. At its northward terminus it intersects with other highways leading to San Antonio, Houston, and other metropolitan areas. The Border Patrol maintains a permanent checkpoint south of Falfurrias on 281, a distance of approximately 70 miles from the Rio Grande.

The third arterial highway to the north is far removed from the last two mentioned. This is Highway 35, originating in Laredo and leading northward to San Antonio. It is perhaps 70 miles to the west of Highway 281. Highway 35 likewise is protected by a Border Patrol checkpoint some 12 to 15 miles north of Laredo.

From an examination of the map, it is evident that one wishing to proceed northward from that portion of the Rio Grande Valley within this judicial district, and who for reasons of his own might wish to avoid the Border Patrol checkpoints on the three above named highways, almost of necessity would pass through the town of Hebbronville. This is so because a series of smaller highways, farm-to-market roads, and county roads which crisscross the wide expanse between Highways 281 and 35 funnel into three highways (1017, 16, and 285), all of which lead through Hebbronville. Despite the fact that many of these roads converge at this point, because the area is not populous, these roads are sparsely traveled. It is the effort of the Border Patrol, with its limited manpower, to protect and monitor these several infrequently traveled highways, which presents the unique feature of this action.

*The Chekar Device*

The roads leading into Hebbronville are monitored with the Chekar device. Highway 1017 is the only one here in issue, although the operation is similar with respect to the others. There is imbedded in the northbound lane of such highway a magnetic device, which reacts when a sizeable metallic mass passes over it. The installation of this mechanism is not apparent to the users of the

highway. The passage of a vehicle above it, however, causes a radio signal to be transmitted, which is received by the Border Patrol agents in their vehicle in or near Hebbronville. As the sounds of the signal differ depending on point of origin, the Border Patrol officers, on receiving the radio signal, are alerted to the fact that a vehicle is proceeding in a northerly direction, at a known distance from Hebbronville, on a particular highway. The officers then take up position to intercept.

The Chekar device is activated only during the hours of darkness. By utilizing the device, one team of officers—in uniform, and using a well marked patrol car with flashing light, etc.—may monitor several highways. It is their duty to stop and inspect for aliens every vehicle the presence of which is brought to their attention by this device during the hours of darkness. Obviously, they are not 100 per cent effective, for if vehicles are approaching simultaneously on different highways, the officers must choose as to which is to be stopped. This, however, is infrequent and they follow their instructions to intercept all such vehicles for the express purpose of determining the immigration status of their occupants. Within the two years preceding the date of trial, on Highway 1017 alone, some 312 illegal aliens had been taken into custody; and some 87 persons arrested and charged with transporting illegal aliens. In these cases the Immigration officers have no warrant to search or to arrest; they have no knowledge whether the vehicle being stopped has recently been across the Rio Grande. During the hours of darkness they do not know whether the occupants of the subject vehicle are of the Anglo or the Latin race until such time as it is stopped.

They know, however, that the location of the Chekar unit is approximately 30 miles from the international boundary; that a number of roads leading directly away from this boundary converge at varying distances south of their location; and they know that §

1357(a)(1) of Title 8 U.S.C.A.[1]—a subsection unaffected by *Almeida–Sanchez* [2]—gives them no right to search, but gives them the right to interrogate. Cf., Cheung Tin Wong v. United States, 152 U.S.App.D.C. 66, 468 F.2d 1123, 1126–1127 (1972).

*United States v. Thompson, et al*

*Cr. 74–L–14*

At about 2:15 a. m. on October 13, 1973, Border Patrol officers Ostrowski and Ellis were on duty in their Border Patrol vehicle near Hebbronville when they received a radio signal indicating that a car northbound was passing the Chekar device on Highway 1017. They knew that it would soon appear at a particular point, at which they took up observation. When the car passed, they pulled it over. Their purpose was to make an "immigration check", that is to determine the citizenship and/or immigration status of the occupants.

The driver, Johnston, immediately exited his vehicle and walked to the Border Patrol vehicle. He stated that he was a United States citizen, which these officers did not then doubt. Ostrowski observed the figures of two other persons in the vehicle, and he walked toward their car to check their citizenship. As he approached the vehicle, through the open window he smelled marihuana, which he immediately recognized from long and extended exposure to its distinctive odor. He had not at that time opened the car door or in any sense intruded into the vehicle.

With knowledge that marihuana was being transported and that a felony was being committed in their presence, the Border Patrol officers [who likewise are commissioned as United States Customs officers pursuant to 19 U.S.C.A. § 1401(i), and see United States v. Thompson, 475 F.2d 1359 (5th Cir. 1973)] directed that the trunk be opened. The trunk key was produced by Thompson, the owner of the vehicle and one of the passengers, and 67 pounds of marihuana were found in the trunk. The defendants contend that this search is controlled by *Almeida-Sanchez* and that the fruits thereof should be suppressed. I do not agree.

A careful reading of that opinion shows that the officers there concerned began and accomplished a thorough search of the subject vehicle, under circumstances not giving rise to the border search doctrine, and without probable cause to believe that the vehicle was carrying aliens, contraband or illegal merchandise. In the course of the search, made under these circumstances, the contraband was found. While the facts of the present case bear a superficial resemblance, the likeness is only skin deep.

In stopping the vehicle for a simple inquiry of the occupants as to their citizenship, officers Ostrowski and Ellis were making no "search" of the vehicle or of its occupants. Such a momentary detention raises no question of "search" under the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Of the many authorities in point, the most recent is United States v. Wilson, 492 F.2d 1160 (5th Cir., 1974). Here at a Border Patrol checkpoint the occupants of a vehicle who were being questioned as to their citizenship sped away. It was held that the stopping and questioning as to citi-

---

1. "§ 1357. Powers of immigration officers and employees—Powers without warrant
 (a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
 (1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;"

2. By reason of *Almeida-Sanchez*'s holding of § 1357(a)(3) unconstitutional, the Separability Clause [§ 406] of the Immigration and Nationality Act [66 Stat. at 281] would clearly apply as to § 1357(a)(1) of Title 8, U.S.C.A.

**342**

zenship was no "search" of the vehicle. *Wilson* cites with approval Haerr v. United States, 240 F.2d 533 (5th Cir. 1957), a nighttime checkpoint case, wherein the officers made use of a flashlight to illuminate the interior of the vehicle which had been stopped.[3]

 Thus when Ostrowski stopped the subject vehicle, spoke to the driver while standing on the pavement, and approached the open window, he had at that moment made no "search"—and there is no evidence to indicate that he intended to do so. But at that point he recognized the presence of the marihuana in the vehicle and at that moment knew to a moral certainty that the vehicle was carrying contraband, to discover which, he was entitled to search. This is no more than an application of the "plain view" doctrine, where the presence of contraband is established by use of the nose rather than the eyes. United States v. Lopez-Ortiz, 492 F.2d 109, 111–112 (5th Cir. 1974); United States v. Leazar, 460 F.2d 982, 984 (9th Cir. 1972); United States v. McCann, 465 F.2d 147, 159 (5th Cir. 1972); United States v. Maxwell, 484 F.2d 1350 (5th Cir. 1973); United States v. Looney, 481 F.2d 31 (5th Cir. 1973).

Thus the motion to suppress in Criminal No. 74–L–14 is denied, the search of the car having been made on probable cause, obtained by the officers while positioned in a place they had a lawful right to be.

*United States v. Boecker*

Cr. 747–L–27

On the evening of September 23, 1973, United States Border Patrolmen Ellis and Ewing were in their marked Border Patrol vehicle in the performance of their duties south of Hebbronville, Texas. At approximately 9:20 p.m., they received a radio signal which indicated that an automobile was northbound on

Highway 1017 some 20 miles south of the city. Ellis and Ewing took up position to await its arrival.

In due course the vehicle came into view. It had a single occupant, the driver, this defendant. The car appeared to be heavily loaded, to a degree that the muffler dragged upon the ground as the vehicle crossed a slightly elevated railroad track. In their effort to detect the presence of illegal aliens, the Border Patrolmen stopped the subject vehicle.

The driver alighted and came to the rear. He was asked to open the trunk, and he stated that the lock was broken. An examination of the lock by the Border Patrolmen did not indicate that it was defective, and one of the Patrolmen removed the keys from the ignition. The trunk opened readily, disclosing the presence of some 183 pounds of marihuana. The presence of this marihuana had been strongly suspected by the Border Patrolman who entered the vehicle to retrieve the keys, as he there detected the odor of air freshener, a device frequently used by marihuana smugglers to disguise the distinctive odor of the weed itself. The defendant was taken in custody and in due course delivered to officers of the Drug Enforcement Administration. The only question presented is that of the admissibility in evidence of the marihuana.

 Contrary to my view expressed as to the facts in the related case set out on the preceding pages, in my judgment there was not sufficient evidence to show probable cause at the time that the search was undertaken by the Border Patrolmen. The question then is presented as to whether the search is valid under the border search doctrine, or what remains of that doctrine since *Almeida-Sanchez, supra.* Careful analysis of what that opinion holds—and what it does not hold, is necessary.

---

3. For other momentary detention cases, see, e. g., United States v. Granado, 453 F.2d 769 (10th Cir. 1972); Cheung Tin Wong v. Immigration and Naturalization Service, 152 U.S.App.D.C. 66, 468 F.2d 1123 (1972); Fernandez v. United States, 321 F.2d 283 (9th Cir. 1963); Myricks v. United States, 370 F.2d 901, 904 (5th Cir. 1967).

In speaking for the majority, Mr. Justice Stewart points out that three types of surveillance along inland roadways are conducted by the Border Patrol. These are permanent checkpoints "maintained at certain nodal intersections; temporary checkpoints . . . established from time to time at various places; and finally, . . . roving patrols such as the one that stopped and searched the petitioner's car." (413 U. S. at 268, 93 S.Ct. at 2537). While it is recognized that categorizing a Border Patrol checkpoint as permanent, temporary, or roving does not determine the constitutional validity of the searches conducted thereby, it is clear that the Court does not in this opinion condemn all border searches at a distance removed from the international boundary. Again referring to the majority opinion, the Court states:

"Whatever the permissible scope of intrusiveness of a routine border search might be searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well. For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches." 413 U.S. at 272–273, 93 S.Ct. at 2539.

Mr. Justice Powell, concurring, recognizes the limitation of the Court's holding (413 U.S. at 276, 93 S.Ct. at 2541):

"Nor does this case involve the constitutional propriety of searches at permanent or temporary check points removed from the border or its functional equivalent[s]."

To the same effect, and again delineating the limitations of the opinion, is the following from the dissent of Mr. Justice White, speaking for four Justices (413 U.S. at 288, 93 S.Ct. at 2547):

" . . . Neither, apparently, is it disputed that warrantless searches for aliens without probable cause may be made at fixed checkpoints away from the border.

"The problem in this case centers on the roving patrol operating away from, but near, the border."

In my judgment, the teaching of *Almeida-Sanchez* is this. A search made of vehicles selected at random or capriciously by officers manning patrol vehicles roving the highways is not constitutionally acceptable, despite the fact that the highway may be close to an international border, and known to be frequented by illegal aliens or smugglers. However, a search of a vehicle may be made within constitutional bounds, under the border search doctrine, (1) at a permanent (or possibly at a temporary) checkpoint; (2) located in close proximity to the border; (3) and at a spot which, from the circumstances, may be considered the functional equivalent of the border. If these criteria are met, a reasonable suspicion—as distinguished from the concept of probable cause—will suffice.

Under the facts of the present case I find the electronic device here in issue, monitored as it is throughout the hours of darkness for 365 days per year, to be a "permanent checkpoint". I further find that its location at or near the confluence of a number of roads leading directly to and from the Mexican border, and thirty air miles therefrom, constitutes a functional equivalent of the border.

In addition to the geographical considerations, I consider it of significance that the road is sparsely traveled, yet yields a high incidence of violators both of the immigration and narcotics laws.[4]

I do not consider the fact that the officers make use of a vehicle to intercept the northbound traffic, nor the fact that the same officers, using the same vehicle, monitor more than one such northbound road, to characterize this operation as the condemned "roving patrol".

4. One of the Border Patrolmen estimated that during a routine midnight to 8:00 a. m. shift 15 to 20 vehicles would be intercepted; the other Border Patrolman estimated no more than 5 to 10 (R. p. 34, 62).

There is no selection by the officers of which vehicles are to be stopped. All are stopped, insofar as their manpower permits. The mechanical portions of the Chekar device are imbedded in the concrete highway, and have been at the same location for four years, which would verify the permanence of the operation. I do not consider that the utilization by the Border Patrol of scientific devices, nor its need to conserve manpower by having the same officers monitor more than one highway, would affect the constitutionality of a search which otherwise would meet the test.

The determination of whether the location of a Border Patrol checkpoint is at the "functional equivalent" of the border will have to be determined on a case-by-case basis. Considering its permanence and the uniformity of its operation, its geographical location, and the minimal inconvenience to the traveling public, I am of the view that this location on Highway 1017 qualifies in every particular.

 Having thus determined that this defendant's stopping occurred at a permanent checkpoint located at a functional equivalent of the border, then that body of case law which has evolved into the "border search doctrine" becomes applicable. The circumstances surrounding Boecker and his automobile [5] were certainly sufficiently articulated factors to give these experienced officers "reasonable suspicion" to search this particular vehicle under the border search doctrine. See, e. g., United States v. Wright, 476 F.2d 1027 (5th Cir. 1973); United States v. Thompson, 475 F.2d 1359 (5th Cir. 1972); United States v. McDaniel, 463 F.2d 129 (5th Cir. 1972); United States v. DeLeon, 462 F.2d 170 (5th Cir. 1972); Annot., 6 A.L.R.Fed. 317; Note, 74 Columbia Law Rev. 53 (1974).

The motion to suppress in Criminal No. 74–L–27 is denied.

5. The out-of-county license plates, the heavily laden rear end, the smell of recently sprayed air freshener, the defendant's proffered explanation that he was enroute to

CONCLUSION

On the merits in Criminal No. 74–L–14, I find the defendant Thompson (the owner of the car) and defendant Johnston (the driver) guilty on Count 1 of the indictment charging possession with the intent to distribute some 67 pounds of marihuana. There being insufficient evidence of the complicity of defendant Arnold as to Count 1, he is acquitted. There being insufficient evidence offered by the government on Count 2 (attempting to distribute the same marihuana), it should be, and hereby is, dismissed as to all three defendants.

On the merits in Criminal No. 74–L–27, I find the defendant Boecker guilty, as charged in the indictment, of possession with intent to distribute some 183 pounds of marihuana.

In both Criminal Nos. 74–L–14 and 74–L–27, a presentence investigation will be prepared by the Probation Service on the defendants herein found guilty. They will present themselves for imposition of sentence on notice.

Clerk will file this Memorandum and Order and furnish counsel and the Probation Service with a copy of same.

participate in a rodeo (despite his apparent lack of equipment for that endeavor), the "broken trunk lock" explanation.