**CHEUNG TIN WONG, Petitioner,**

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE,**
Respondent.

No. 71–1569.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 11, 1972.

Decided Aug. 31, 1972.

Mr. David Carliner, Washington, D. C., for petitioner.

Mr. Murray R. Stein, Atty., Dept. of Justice, of the bar of the Court of Appeals of Maryland, pro hac vice, by special leave of Court, with whom Messrs. Henry E. Petersen, Acting Asst. Atty. Gen., and George W. Masterton, Atty., Dept. of Justice, and Harold H. Titus, Jr., U. S. Atty., were on the brief, for appellee.

Before McGOWAN and MacKINNON, Circuit Judges, and FRANK A. KAUFMAN,* District Judge, United States District Court for the District of Maryland.

MacKINNON, Circuit Judge:

This is a petition for review of a decision of the Board of Immigration Appeals denying an appeal from a deportation order issued against petitioner by a Special Inquiry Officer. The basis for the deportation order was documentary evidence from the files of the Immigration and Naturalization Service (INS) which indicated that petitioner was a 28-year-old Chinese seaman who had illegally entered the United States by jumping ship in New York on May 18, 1967. These incriminating documents were retrieved from the INS files subsequent to petitioner's arrest as an illegal alien by an INS investigator on July 13, 1970. Petitioner contends that his arrest was illegal and that the documents which provided the evidentiary basis for the deportation order were the fruits of that illegal arrest and should have been suppressed in the deportation proceedings. The Government responds that the documents were in the INS files—not obtained from the person or effects of petitioner—and therefore were admissible regardless of the circumstances of petitioner's detention, and, in the alternative, that there was nothing illegal about that detention. We believe that there were no improprieties committed in the course of petitioner's detention and arrest and we accordingly affirm the decision of the Board of Immigration Appeals without reaching the Government's contention that the deportation order could be supported by the documentary evidence without regard to the circumstances of petitioner's apprehension.

I

At the time of petitioner's arrest Gregory George Podrasky had been an investigator with the INS for more than 18 years, having been assigned to the Washington, D.C. District office since 1958. At approximately 10:45 A.M. on July 13, 1970 Podrasky was driving south on South Capitol Street in the Southeast portion of the District of Columbia. Just past the underpass beneath Interstate 295, South Capitol curves slightly to the left so that Podrasky observed two men, petitioner and an unidentified companion, directly in front of his car walking north along the sidewalk in the block between Chesapeake and Atlantic Streets. There is, in this area, a shopping center whose establishments include a Chinese restaurant. Both men appeared to Podrasky to be Chinese or of Chinese descent; one wore dark trousers and an ordinary white dress shirt; and the other, petitioner, wore gray pants and a white shirt described by Podrasky as being of the type worn by busboys. Podrasky was driving only 20–25 miles per hour, and as he passed the two men he continued to observe them in his rear view mirror. He saw them stop a taxi that was headed east on Atlantic Street at the corner of South Capitol. Petitioner entered the back seat of the cab and his companion bent over by the front door and appeared to be giving the cab driver instructions. Believing that these circumstances suggested strongly that the passenger, petitioner, could not speak English, Podrasky pulled to the curb about ¾ of the way down the block toward Chesapeake and continued to observe the taxi and the two men.

When petitioner's companion turned and walked away from the cab Po-

* Sitting by designation pursuant to 28 U.S.C. § 292(c) (1970).

drasky's suspicions about petitioner's possible status as an alien crystallized into action. He made a U-turn across South Capitol, and with the stop light at Atlantic in his favor he turned left onto Atlantic, pulled over to the curb opposite the taxi and hailed the cab while it was waiting for the light to change. He identified himself to the driver as an INS investigator and asked him to remain stopped while he asked his passenger, the petitioner, a few questions. Podrasky then asked petitioner, "How you come to the United States?" Petitioner replied only, "no papers, no papers." Podrasky then moved out of the street to the curb side of the cab and continued unsuccessfully his attempts to elicit some identifying information or papers from petitioner. There was a considerable language problem, but petitioner finally indicated that his name was Cheung Tin Wong and that his papers were at Lee's Cafe on Georgia Avenue in Northwest Washington. At this point Podrasky told the cab driver that he was taking his passenger from him and petitioner got out of the cab. Podrasky initially sought to have petitioner take him to the companion who had placed him in the taxi, but petitioner insisted instead on going to Lee's Cafe. Podrasky acquiesced and petitioner voluntarily walked over to Podrasky's car and got in the passenger side while Podrasky entered the driver's side. They drove to Lee's Cafe.

Upon arrival at Lee's Cafe petitioner unlocked the two outer doors and entered with Podrasky. Another individual of Chinese descent was inside cooking, and petitioner talked with him in Chinese, then made some telephone calls. Finally Podrasky asked him about his papers again and they both went upstairs to a room where petitioner apparently lived. After looking through his belongings unsuccessfully, petitioner stated again that he had no papers and they returned downstairs. Petitioner then called his attorney, but upon having great difficul-ty communicating with counsel's secretary Podrasky took the phone to talk with her and she informed him that counsel had no client named Cheung Tin Wong. It was apparently at this point that Podrasky informed petitioner that he would have to come down to the INS offices in order to clear up his problem. Podrasky then sat by while petitioner made several calls to order provisions for the restaurant, then he assisted petitioner in calling a waitress in to take care of the restaurant while they went to the INS offices. While they waited for the waitress to arrive, petitioner went upstairs again, unaccompanied by Podrasky, to change clothes. After the waitress arrived, Podasky and petitioner left for the Immigration Service District office.

At the District office Podrasky began a series of phone calls to the Central Office and the New York office where the INS files revealing petitioner's illegal entry into the country were located. These documents subsequently provided the evidentiary basis for the deportation order issued by the Special Inquiry Officer following a deportation hearing held on August 18, 1970. At this hearing petitioner had unsuccessfully argued that the documents should be suppressed as the fruits of an illegal arrest. The Board of Immigration Appeals heard oral argument on petitioner's appeal from the deportation order on March 3, 1971, at which time he renewed his attack on the legality of his apprehension and the admissibility of the documents. The Board denied his appeal on June 22, 1971 and this petition followed.

## II

Petitioner's challenge to the legality of his arrest places us at the intersection between the Fourth Amendment's protection against unreasonable "seizures" and the statutory scheme for enforcement of the immigration laws. The statute principally involved in this case is 8

U.S.C. § 1357(a)(1) (1970),[1] which provides:

> Any officer or employee of the [Immigration and Naturalization] Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
>
> (1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States; . . . .

We have had two occasions in the recent past to examine this statute. Au Yi Lau v. United States Immigration and Naturalization Service, 144 U.S.App.D.C. 147, 445 F.2d 217 (1971); Yam Sang Kwai v. Immigration and Naturalization Service, 133 U.S.App.D.C. 369, 411 F.2d 683 (1969), cert. denied, 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1970). In *Au Yi Lau* we described *Yam Sang Kwai* as having held that Section 1357(a)(1) grants

> to immigration officers the right to seek to interrogate individuals reasonably believed to be of alien origin. The underlying rationale of that decision was that the minimal invasion of the privacy of the individual approached for questioning was justified by the special needs of immigration officials to make such interrogations. This allowance for mere questioning, which assumes the individual's cooperation, is analogous to decisions which have contemplated the same scope of authority for police officers [citing Green v. United States, 104 U.S.App. D.C. 23, 259 F.2d 180 (1958), cert. denied, 359 U.S. 917, 79 S.Ct. 594, 3 L.Ed.2d 578 (1959)], as well as for other administrative officials [citing United States v. Grandi, 424 F.2d 399 (2d Cir. 1970)].

144 U.S.App.D.C. at 152, 445 F.2d at 222. However, *Au Yi Lau* presented the additional question of the propriety of a forced detention for questioning, and we noted the effect of this distinction:

> We believe the statutory interrogation authority comprehends such detentions, but, because they are far greater intrusions upon personal privacy than the non-forcible approaches, and since aliens in this country are sheltered by the Fourth Amendment in common with citizens, such a reading of the Congressional mandate must be controlled by the constitutional standards governing similar detentions made by other law enforcement officials. *See* Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We hold that immigration officers, in accordance with the Congressional grant of authority found in Section 287(a)(1) [8 U.S.C. § 1357(a)(1)], may make forcible detentions of a temporary nature for the purposes of interrogation under circumstances creating a reasonable suspicion, not arising to the level of probable cause to arrest, that the

---

1. While we do not rely on it here, § 1357 (a)(3) might also be argued to support Podrasky's actions. Subsection (3) similarly provides that authorized INS personnel

shall have power without warrant—

\* \* \* \* \*

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any . . . conveyance, or vehicle . . . .

The Service has, by regulation, defined "a reasonable distance" as "within 100 air miles from any external boundry of the United States." 8 C.F.R. § 287.1 (a)(2) (1972). Since Washington clearly falls within these limits, this portion of the statute would, arguably, expressly authorize Podrasky to have boarded petitioner's taxi to "search" for aliens therein. The statute is, of course, subject to some limitations, *see* Roa-Rodriquez v. United States, 410 F.2d 1206 (10th Cir. 1969), but in view of our disposition of this case on other grounds we do not consider it necessary to examine or attempt to apply those limitations to the facts presented here. We note only that this subsection reflects the congressional purpose to imbue immigration investigators with rather broad investigatory powers within certain geographical areas where the presence of illegally entering aliens is most likely.

individual so detained is illegally in this country. Utilizing the standards developed in *Terry,* such detentions are to be judged from case to case by reference to the particular facts of each.

144 U.S.App.D.C. at 153, 445 F.2d at 223.

Petitioner characterizes his initial confrontation with Podrasky—when Podrasky walked up to the taxi and asked the driver to wait a moment while he questioned his passenger—as a forcible detention within the meaning of *Au Yi Lau.* Under such a characterization the propriety of that detention would be evaluated against the "reasonable suspicion" standard of *Au Yi Lau,* and petitioner contends that the circumstances of his appearance and entry into the cab were not sufficiently suspicious to justify his detention. We cannot accept either his characterization of the encounter or the conclusion he would have us draw therefrom.

In evaluating the reasonableness of Podrasky's actions we have the benefit of a recent Supreme Court decision that draws upon *Terry:*

> In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S., at 22, 88 S.Ct. at 1880. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. See *id.,* at 23, 88 S.Ct. 1868, 20 L.Ed.2d 889. *A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in*

*light of the facts known to the officer at the time. Id.,* at 21–22; 88 S.Ct. 1868, 20 L.Ed.2d 889; see Gaines v. Craven, 448 F.2d 1236 (CA9 1971); United States v. Unverzagt, 424 F.2d 396 (CA8 1970).

Adams v. Williams, 404 U.S. 1014, 92 S.Ct. 670, 30 L.Ed.2d 661, (1972) (emphasis added). Whether Podrasky's initial encounter with petitioner is considered to be a "mere questioning" in the sense of our holding in *Yam Sang Kwai,* or a "brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information" in the sense of the Supreme Court's decision in *Adams,* we find Podrasky's action fully justified by the facts presented to him.

■ Podrasky's attention was initially drawn to petitioner and his companion by their distinctively oriental appearance and their clothing. We do not in any way intend to suggest that the appearance of being oriental is in any respect "suspicious", and we wish to state in unequivocal terms that we could never condone stopping or questioning an individual simply because he looked to be of oriental descent. Nonetheless, we need not be so naive as to blink at the reality of the fact that many of the aliens who illegally enter the United States each year are oriental seamen who desert their ships at such major seaports as New York, Philadelphia, and Baltimore in our geographical area. Nor do we need to ignore the fact that many such illegal entrants find employment in and around food service establishments, particularly those specializing in oriental cuisines where other employees are likely to be conversant in their native languages. The Special Inquiry Officer expressly found that petitioner's physical appearance and attire were not, by themselves, reasonable indicia of suspicion, and we concur in that finding as a proper conclusion of law. However, while these facts could not reasonably have led

Podrasky to conclude that he should stop petitioner for interrogation, they are sufficient, we believe, to have reasonably induced an immigration investigator with Podrasky's long years of experience to continue to observe petitioner.

The analogy to *Terry* is indeed striking. Walking up and down a public sidewalk looking in store windows, and conversing together on a street corner are wholly innocent activities in themselves. But they were, in the circumstances of that case, sufficient to attract the attention of an experienced police officer and cause him to observe the individuals involved until their oft-repeated performance of the stroll induced a reasonable suspicion that they were planning a holdup. Here, the appearance and dress of petitioner and his companion were also wholly innocent. But in close proximity to a Chinese restaurant they were sufficient to attract the attention of an experienced immigration investigator and cause him to continue to observe them.

█ It is thus the circumstances surrounding petitioner's entry into the taxi that we find provided Podrasky with reasonable suspicion to induce his search for more information. Those circumstances, as we previously described them, strongly suggested that petitioner did not speak English. It is unlikely that an American citizen of oriental descent would be incapable of speaking English well enough to order a cab for himself. If he were a native Chinese-American presumably the nearly universal requirement for compulsory elementary education would have given him some facility in English; and English literacy is a statutory requirement for becoming a naturalized citizen. 8 U.S.C. § 1423 (1970). Circumstances suggesting an inability to speak English were thus sufficient grounds for Podrasky's suspicion that petitioner was an alien, and Section 1357(a)(1) thus empowered him to "interrogate" petitioner "as to his right to be or to remain in the United States."

*See Yam Sang Kwai, supra.* This is all he did when he approached the taxi, identified himself to the driver and petitioner, and asked the simple question, "How you come to the United States?"

█ When petitioner responded "no papers, no papers," the relationship between him and Podrasky altered significantly. All aliens legally within the United States are required to carry some form of identification papers on their person at all times, violation of this requirement being a misdemeanor. 8 U.S. C. §§ 1304(d) and (e) (1970); *see* list of prescribed forms covering various classes of legal aliens at 8 C.F.R. § 264.1 (b) (1972). Even if petitioner were a United States citizen he would, because of his age, be under a statutory obligation to have a Selective Service registration card in his possession. 50 U.S.C. App. § 453 (1970); 32 C.F.R. § 1617.1 (1972). His failure to produce any such documents strongly corroborated Podrasky's suspicion that petitioner was an alien illegally in this country. However, the language barrier between them made Podrasky uncertain of his evaluation, and when petitioner seemed to be suggesting that he had papers at Lee's Cafe, Podrasky determined not to effectuate an immediate arrest but rather to accompany petitioner to the restaurant to see whether he did in fact have papers justifying his presence in the country. Although there is no evidence whatsoever of coercion connected with the drive to Lee's, we believe that the facts available to Podrasky at this time would have amply provided him with that "reasonable suspicion" we found sufficient in *Au Yi Lau* to warrant a "forcible detention of a temporary nature for the purposes of interrogation."

█ Finally, we have no difficulty in concluding that when petitioner failed to produce any documents after looking through his possessions at the cafe, Podrasky had reason to believe petitioner was in the country illegally. It was at

this point that he arrested petitioner and made arrangements to take him to the District office of the INS for further investigation. We find nothing improper in this arrest.

Since we believe that the immigration investigator acted properly at all stages of his encounter with and apprehension of petitioner, we find that the Special Inquiry Officer and the Board of Immigration Appeals were correct in denying petitioner's motion to suppress the documentary evidence introduced against him at the deportation hearing. That evidence adequately supports the deportation order, and the decision of the Board of Immigration Appeals denying an appeal from that order is, accordingly,

Affirmed.

FRANK A. KAUFMAN, District Judge (concurring):

In this case, petitioner's own testimony reveals that he had just entered the cab and that the cab had only begun to start up from its stationary position at a traffic signal when Podrasky approached the cab, showed his credentials, asked the driver to hold up, questioned petitioner about his papers, and was informed by petitioner that he had no papers. All of this apparently took only a few seconds. Thus, if there was any detention before petitioner stated he had no papers, such detention was most quick, most specific and not inappropriate under the circumstances. Once petitioner stated he had no papers, "the relationship between him and Podrasky altered significantly", as Judge MacKinnon has written, and provided cause for Podrasky's subsequent actions. However, whether there was a sufficient basis for Podrasky's initial suspicion concerning petitioner's status to permit more than the briefest delay and a single specific question presents, in my opinion, a serious question which does not need to be resolved herein.