Sara Flores MARQUEZ, Isabel Maria Flores, and Miguel Eduardo Marquez, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

Maurice F. KILEY, Director, New York District, Immigration and Naturalization Service, John Weiss and William Carroll, Investigators, Immigration and Naturalization Service, Leonel J. Castillo, Commissioner, Immigration and Naturalization Service, Griffin B. Bell, Attorney General of the United States, Defendants.

No. 73 Civ. 1078.

United States District Court, S. D. New York.

June 24, 1977.

Melvin L. Wulf, David A. Barrett, American Civil Liberties Union Foundation, New York City, Leon Rosen, New York City, for plaintiffs.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for defendants; William G. Ballaine, Asst. U. S. Atty., New York City, of counsel.

MEMORANDUM

LASKER, District Judge.

Plaintiffs, Sara Flores Marquez (Mrs. Marquez), her sister, Maria Flores (Ms. Flores) and her husband, Miquel Marquez (Mr. Marquez), are citizens of Ecuador who currently reside in the United States. They sue the Attorney General, the Commissioner of the Immigration and Naturalization Service (INS), the Director of the New York District of the INS and two INS investigators, alleging that their interrogation and Mr. Marquez's subsequent arrest by the two INS investigators violated § 287(a) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)[1] and the Fourth Amendment of the United States Constitution. They seek damages for themselves and on behalf of a class of similarly situated aliens, they seek declaratory and injunctive relief.

The action was tried to the court without a jury. This memorandum constitutes our findings of fact and conclusions of law.

*I. Factual Background*

Mr. Marquez is a native and citizen of Ecuador. He arrived in the United States on October 27, 1968 as a non-immigrant visitor under a visa permitting him to remain for thirty days. His stay was extended for an additional period to May 30, 1969. Since that time he has remained in the United States without lawful authority. Shortly after his arrival here, he obtained employment with the Langer Manufacturing Company on 60th Street in Brooklyn, New York, and worked there continuously to the time of the events which gave rise to this suit. He has never applied for or received permission from the INS to accept employment.

Mr. Marquez resides with his wife, plaintiff Sara Flores Marquez, at 553 41st Street, Brooklyn, New York. Mrs. Marquez is also a citizen of Ecuador. However, she was admitted for permanent residence in the United States on March 23, 1969. At the time of the incident which forms the basis of her complaint, Mrs. Marquez was working as a machine operator at the Duke Lamp Shade Company on 35th Street and 3rd Avenue in Brooklyn.

Maria Flores, Mrs. Marquez's sister, is also a citizen of Ecuador and a permanent resident alien of the United States, a status she obtained on December 1, 1972. She, too, resides at 553 East 41st Street and works at the same establishment as her sister.

At all relevant times the defendants John Weiss and William Carroll were INS investigators assigned to the Area Control Investigations Unit, whose task was to locate and apprehend illegal aliens. Their practice was to enter areas of the city which they believed to contain a large alien population, accost individuals whom they believed to be aliens and inquire into their citizenship or alien status. If as a result of their inquiries they had reason to believe that a particular individual was unlawfully in the country, they would either make an arrest, or issue a pass requiring the person to appear at INS headquarters at a later date, a process termed "passing in."

Weiss and Carroll had substantial discretion to work in any area they chose within their assigned territory, which encompassed all of Brooklyn, Queens and Long Island. In late December, 1972 or early January, 1973, they examined a number of "complaints" ("G 123 forms") in their files in the course of planning their activities in the near future. These forms are records of telephone calls received by the INS reporting the presence of persons suspected of

1. In relevant part the statute provides:
 "Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
 (1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

 (2) to arrest . . . any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [provision of the law or regulation governing the admission, exclusion or expulsion of aliens] and is likely to escape before a warrant can be obtained for his arrest . . . ." 8 U.S.C. § 1357(a).

being aliens. A number of these complaints reported the presence of Latin and South American aliens in the Bay Ridge section of Brooklyn, and the investigators decided to direct their efforts to that area.

Weiss and Carroll determined to go to Bay Ridge not only because of these reports, but also because on the basis of their personal experience they believed it to be a neighborhood in which large numbers of aliens could be found. Carroll's belief was based in part on personal familiarity with the area; he was born in Brooklyn, had friends from Bay Ridge and went to school nearby. More closely related to the subject, Carroll's impression of the character of Bay Ridge was based on his experience as an INS Investigator. In the year he had been with the INS Carroll had been to Bay Ridge on seven or eight occasions to investigate complaints regarding illegal aliens and each visit resulted in arrests. In all, Carroll had been personally involved with twenty arrests of aliens who lived, worked or were found in Bay Ridge. Moreover, Carroll had been informed by other investigators that in one morning in the Fall of 1972 fifteen illegal aliens had been arrested at a single location in Bay Ridge.

On Sunday, January 7, 1973, Weiss and Carroll went to Bay Ridge. On this occasion they arrested five illegal aliens from Mexico at an apartment house on 50th Street. Because they had information that these five were living with or near other illegal aliens, they decided to return the next day.

Early in the morning on January 8th, Weiss and Carroll again drove to Bay Ridge. Near 4th Avenue and 39th Street they arrested two individuals from Ecuador. With these two in the back seat of their car they proceeded down 40th Street toward 5th Avenue. Here, at about 7:30 A.M., Weiss saw the three plaintiffs, who were walking to work. He signaled Carroll, who was driving, to stop the car.

Weiss testified that what brought his attention to the plaintiffs in the first instance was their physical appearance. Like the two Ecuadorians he had arrested moments before, plaintiffs' features seemed to Weiss to be of a type commonly associated with South American Indian peoples, that is smooth black hair and olive complexion. Moreover, Weiss noted that they were dressed in clothes which he believed typical of factory workers and that one of them [2] was carrying what appeared to be a lunch bag. Weiss recalled that Mr. Marquez appeared to be wearing a heavy, unfashionable looking coat and pointed, "possibly foreign" (Tr. 122) shoes.

Carroll stopped the car about 30 feet ahead of the plaintiffs and Weiss got out and observed them for a few more moments before approaching them. He noted that their conversation was in Spanish. At this point, Weiss stepped up to the plaintiffs, identified himself as an INS official and inquired in Spanish as to their nationalities. The three responded that they were from Ecuador.

Carroll, who had by this time joined Weiss, inquired further of Mr. Marquez, while Weiss spoke to the two women. On inquiry, Mr. Marquez readily related that he had entered the country on a tourist visa and that he was working. Carroll then asked him to get into the car.

Meanwhile, the two women explained to Weiss that they were permanent residents and produced their alien registration, or "green" cards. Mrs. Marquez's card appeared to be in order and Weiss returned it to her. However, the card of Ms. Flores appeared to Weiss to be irregular.[3] Accord-

---

2. There is a minor conflict in the testimony whether it was Mr. or Mrs. Marquez who had the bag. Weiss testified that Mr. Marquez was carrying a brown paper bag (Tr. 122); Mrs. Marquez testified that it was she who was carrying a black plastic bag. (Tr. 60) Resolution of this discrepancy in no way affects the outcome of the case. It is not disputed that one of the plaintiffs had a bag.

3. The gridding on the back, which consists of wavy lines superimposed over the alien's photograph, did not consist of single wavy lines, as a valid card normally does and the lines appeared to be sharper than normal. Moreover, the date of entry entered on the card differed

ingly, he asked her, too, to get into the car for further questioning.

Mrs. Marquez, who had been told she was free to leave, followed the investigators and her companions to the car to explain that she was married to Mr. Marquez and that they should therefore not arrest him.[4] However, the name on her green card was Flores, not Marquez, and she had no independent proof of their marriage status. Because it was bitter cold, the investigators asked her to sit in the front seat while she continued to seek her husband's release. Mr. Marquez and Ms. Flores were seated in the rear, along with the two men who had been previously arrested. Weiss remained outside the car speaking through the open window. The investigators explained that if Mrs. Marquez brought a proof of marriage to headquarters they would release Mr. Marquez, but that they would not do so only on the Marquez' word that they were married. After about five minutes she left the car.

During this conversation, the only paper or document which Mr. Marquez could produce was a lawyer's business card. However, although it was the fact, he did not volunteer that this attorney was currently representing him before the INS in his efforts to obtain permanent resident status.[5] Weiss and Carroll did not inquire into the significance of the card. They asked only whether Marquez had any documents indicating that the INS was aware of his presence here and received a negative response.

When Mrs. Marquez left the automobile, Weiss and Carroll attempted to make radio contact with headquarters to check on Ms. Flores' status. Being unable to make contact, they decided to move the car and shortly succeeded in getting through to headquarters. While they were waiting for an answer to their inquiry, they cruised around the neighborhood, and when after six or seven minutes they learned that Ms. Flores was indeed a lawful permanent alien, they let her out of the car several blocks from where she was picked up. See n. 8, *infra.*

The investigators proceeded to drive to 50th Street, where they had arrested the five Mexican aliens the previous day, and then returned to headquarters. Upon arrival they were told that Mr. Marquez's attorney had contacted headquarters and that Marquez should be allowed to leave. He was released between 8:30 and 9:00 A.M.

## II. Discussion

The case presents two distinct issues: Whether Weiss and Carroll are liable to the plaintiffs in damages for their actions on January 8, 1973 and whether the plaintiffs are entitled to a declaratory judgment and injunction narrowing the authority of INS officers to stop and inquire under § 287(a)(1).

### A. The Damages Claim

 The plaintiffs' claim for damages is directed solely at Weiss and Carroll.[6]

---

from the date Ms. Flores gave to Weiss when he questioned her.

4. The investigators were instructed that although an illegal alien who is married to a permanent resident alien is technically subject to deportation, such a person is generally able to obtain permanent residency, and, in addition, is not to be considered likely to escape within the meaning of § 287(a)(2). (Tr. 101–03) Accordingly, on satisfactory proof of marriage, Mr. Marquez would have been passed in. It is INS policy, however, that as a general matter, an unsupported statement of marriage, is not alone sufficient. (Tr. 255).

5. The fact that Mr. Marquez was currently involved in proceedings before the INS, if made

known to Weiss and Carroll, would also have resulted in passing him in. (Tr. 184–86) Carroll testified, however, that in his experience, an alien in this situation generally carries documents with him at all times which indicate that the case is "known to the service," or volunteers to produce such documents in short order (Tr. 218–21). He testified further that it is not possible to verify this fact by calling headquarters on the phone. (Tr. 228)

6. The complaint nowhere specifies that damages are sought only against Weiss and Carroll. However, on the damages claim, plaintiffs' post-trial memorandum is directed exclusively to the question of the investigators' culpability. In any event, there is no basis for an award of

The critical question is whether the investigators were acting in accordance with procedures they reasonably and in good faith believed to be lawful. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Bivens v. Six Unknown Named Agents,* 456 F.2d 1339, 1347–48 (2d Cir. 1972), on remand from 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

At the time of this incident Weiss and Carroll had been full-time INS employees for about a year. During this period they had received extensive instruction regarding their authority under § 287(a) to interrogate suspected aliens and, under some circumstances, to arrest those who appear to be unlawfully in this country. They were familiar with a booklet entitled "Authority of Officers of the Immigration and Naturalization Service to Make Arrests." (DX A) As to the power to stop and question without a warrant pursuant to § 287(a)(1), the booklet reads:

> "An immigration officer has the power without warrant to question any alien or person believed to be an alien as to his right to enter, reenter, pass through, or reside in the United States. [citations omitted] . . . This questioning, if conducted in a reasonable and business-like manner would not amount to an arrest. [citations omitted]
>
> \* \* \* \* \* \*
>
> "In questioning any person as to his right to reside in the country, alienage is the primary fact to be established and the person accosted may well be asked to state his citizenship. If he replies that he is a citizen and there is no apparent reason to doubt his claim, the interrogation should not be pursued further. . . . If, on the contrary, he admits that he is an alien, the officer must then, in the performance of his duty, question him

further to determine whether he is lawfully in the United States." (SX A, 5–6)

Through their training Weiss and Carroll were also familiar with the "Investigators Handbook" which, in addition to repeating the message quoted above, contains the following caveat regarding the limitations on their power to engage in selective interrogation:

> "*Selective Interrogation*
>
> While section 287 authorizes immigration officers to interrogate, without warrant, any alien or person believed to be an alien regarding his right to be or remain in the United States, this authority is not license to interrogate persons indiscriminately or on a wholesale basis. The investigator must bear in mind that he should have what a reasonable person would consider 'reason to believe' that the person he proposes to interrogate is an alien. Prompt identification of himself as an immigration officer is as basic as a demonstrable respect for the rights and sensitivities of the person being interrogated." (DX B 9).

With regard to Area Control Operations, the handbook advises:

> "5. Area control operations are basically selective on-the-scene interrogations which are authorized by section 287. It should be remembered that these inquiries are interrogations pursuant to section 287(a)(1), and may not necessarily involve an arrest. Under the authority of *Terry v. Ohio,* 392 U.S. 1 (1968) interrogation may involve some measure of brief restraint." (DX B 8)

An appendix to the Handbook elaborates the right briefly to detain an individual pending clarification of his status:

> "1. You do *not* need probable cause to make a stop.
>
> \* \* \* \* \* \*

---

damages against the other defendants. To be liable for the acts of subordinates supervisory officials "must have had knowledge of the acts constituting the violation, *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir. 1973), and must have disregarded 'basic, unquestioned constitutional

rights,' *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)." *Gilliard v. Oswald,* 552 F.2d 456 at 464 (2d Cir. 1977) (Oakes, J., dissenting). Neither of these elements has been established.

7. You may move the person a *short distance* to carry out your questioning, or to take other appropriate action, (i. e. you could require him to go to the car or nearest telephone, while you called to check a registration; you could not require him to go to the station house.)" (DX C, 2, 3)

Regarding the power of *arrest* provided in § 287(a)(2), both manuals also instruct that the statutory authorization is limited to circumstances in which the investigator believes a person to be *both* unlawfully in the country and likely to escape before a warrant can be obtained. (DX A 41, DX B 1–2) The booklet states that the investigator "must decide whether a person is likely to escape, and his determination will control· if it has any reasonable basis." (DX A 4) The Handbook cautions that:

"It is a matter plainly for the investigator to decide whether the person is likely to escape, and his determination will control if it has any reasonable basis. He should stop and think over whether the three conditions, particularly the likely to escape (sic), have been met prior to an arrest without warrant." (DX B 5)

These somewhat academic formulations were given practical meaning in the investigators' on-the-job training. They were taught that reason to suspect alienage, the single prerequisite to street interrogation, can arise from the confluence of a number of factors, such as appearance, clothing, location, time of day and language, or, in some circumstances, from any one of these alone. They were further instructed that in determining whether to effect an arrest, a key consideration in evaluating the likelihood of escape is the person's ties to the community, such as family or property connections.

### 1. The Initial Stop and Inquiry

■ It was with this background that Weiss and Carroll proceeded in their Area Control activities on the morning of January 8, 1973. The investigators candidly testified that what first brought their attention to the plaintiffs was their physical appearance. However, this is not, as the plaintiffs would have it, the only tangible factor on which the defendants relied. The investigators were operating in Bay Ridge because they believed it to be an area with a fairly high concentration of illegal aliens, particularly from Central and South America. In particular they were aware of a number of complaints which had been received by the INS regarding the presence of illegal aliens in Bay Ridge and of the fact that a substantial number of arrests had been effected in the area in recent months. Indeed, the day before the incident in question, Weiss and Carroll themselves had taken five illegal aliens into custody from this neighborhood and immediately prior to spotting the plaintiffs, had arrested two more. Additionally, the investigators were taught in their on-the-job training that many illegal aliens find employment in factories, and, in view of the time of day and the plaintiffs' clothing, and the further fact that at least one of them was carrying a lunch bag, they suspected that the three plaintiffs were on their way to work in such employment. Finally, Weiss also testified that after leaving his car but prior to approaching the plaintiffs, he paused for a few seconds as they walked in his direction and noted that their conversation was in the Spanish language.

We conclude that all of these factors, taken together, were sufficient to provide the investigators with a reasonable, good faith belief that they were entitled at this point to stop the plaintiffs and inquire into their citizenship status. The plaintiffs' physical appearance, their dress, the character of the neighborhood and the time of day all led the defendants to suspect that the plaintiffs might be aliens—as, indeed, they are. These are precisely the kinds of factors the defendants had been trained to believe they could legally rely upon in conducting Area Control operations. Moreover, these instructions can in no way be said to the clearly erroneous in view of the leading cases interpreting the scope of authority to stop and inquire under § 287(a) at the time of the incident. See, e. g., *Cheung*

*Tin Wong v. INS,* 152 U.S.App.D.C. 66, 468 F.2d 1123 (1972); *Au Yi Lau v. INS,* 144 U.S.App.D.C. 147, 445 F.2d 217, *cert. denied,* 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971), discussed *infra.*

### 2. The Arrest of Mr. Marquez and Detention of Ms. Flores

■ Upon questioning by Carroll, Mr. Marquez readily related that he was a foreign citizen who entered the country on a non-immigrant visa and, further, that he was employed. Plaintiffs do not dispute that at this point, Carroll had reasonable belief that Mr. Marquez was in violation of the immigration laws [7] and subject to deportation proceedings. However, under § 287(a)(2), in order to make an arrest an officer must not only have reason to believe that a violation of the law has occurred, but he must also reasonably believe that the individual "is likely to escape." 8 U.S.C. § 1357(a)(2). See n. 1, *supra.* Plaintiffs argue that there was no basis for such a belief in this case.

This additional qualification of an officer's right to effect an arrest obliges INS officers to make an on the spot determination, with no opportunity to verify information provided or to conduct a full-scale interview, whether a person whom they reasonably believe is illegally in the country will voluntarily cooperate with the government's investigation and possible deportation proceedings. It is no doubt for this reason that courts have held, essentially, that an officer's determination will not be upset if there is any reasonable basis for it. See, e. g., *United States v. Cantu,* 519 F.2d 494 (7th Cir.) *cert. denied,* 423 U.S. 1035, 96 S.Ct. 569, 46 L.Ed.2d 409 (1975); *United States v. Meza-Campos,* 500 F.2d 33, 34 (9th Cir. 1974); *LaFranca v. INS,* 413 F.2d 686, 689 (2d Cir. 1969); *Hon Keung Kung v. INS,* 356 F.Supp. 571, 576 (E.D.Mo.1973); *Taylor v. Fine,* 115 F.Supp. 68, 70 (S.D.Cal. 1953).

■ Judged by this standard we cannot say that Weiss and Carroll erred in arresting Mr. Marquez. The testimony at trial established that the agents were trained to inquire into a person's marital and property ties in deciding whether to arrest an individual or to "pass him in." When queried in this regard Mr. and Mrs. Marquez did claim to be married, a fact which, if accepted, would have made arrest a questionable procedure. See n. 4, *supra.* However, plaintiffs furnished nothing to substantiate this claim, and the only documents available negated a husband-wife relationship, since Mrs. Marquez's green card was in her maiden name of Flores. It is true that the papers Mrs. Marquez produced, an attorney's business card, might have alerted the investigators to question him about his legal representation. If they had done so, they might have learned that the lawyer was at that time representing Marquez in an INS proceeding, a fact which also would have resulted in "passing him in." See n. 5, *supra.* However, they did not inquire, and Marquez did not inform them. While the investigators did not testify to any questions of Mr. Marquez regarding his property ties to the community, Marquez offered no evidence of the existence of such ties.

Thus, while the investigators' inquiries into the likelihood of escape may not have been as thorough as one would desire, we cannot say that their decision to arrest Marquez crossed the line of permissible discretion.

■ Ms. Flores' claim for damages may be disposed of more quickly. Based on the irregular appearance of her green card, Weiss and Carroll reasonably suspected the legitimacy of her claim to be a legally resident alien. Accordingly, they were entitled briefly to detain her while they verified her claim by radio contact with INS headquarters. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). See *Cheung Tin Wang v. INS, supra,* 468 F.2d 1123, 1124–25; *Au Yi Lit v. INS, supra,* 445 F.2d 217, 222–23. We credit the testimony of

---

7. Any alien who has been admitted as a non-immigrant and failed to maintain his status or comply with the conditions of his status is subject to deportation. 8 U.S.C. § 1251(a)(9). It violates a condition of this status to engage in any employment. 8 C.F.R. § 214.1(c) (1977).

the officers that they released Ms. Flores as soon as they learned that she was indeed a lawfully resident alien in the country,[8] and, accordingly, her claim for damages must fail.

### B. The Claim for Declaratory and Injunctive Relief

■ Area Control Operations were conducted pursuant to the authority of § 287(a)(1), which authorizes INS officers without warrant "to interrogate any . . person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Plaintiffs seek a declaratory judgment and related injunction that in order to conform to constitutional standards this statute must be read to require a reasonable suspicion that an individual is an *illegal* alien prior to conducting an investigatory stop. Before reaching the merits of this claim, it is necessary to dispose of plaintiffs' rather untimely motion for class certification under Fed.R.Civ.P. 23(b)(1)(A) and (b)(2), which was made only at trial.[9]

### 1. Class Action Certification

■ Class certification is sought only with regard to the claim for declaratory and injunctive relief. In such circumstances, and where in addition the defendants are government officials and the issue relates to the constitutionality of a statute or administrative procedure, class certification "is largely a formality." *Galvan v. Levine,* 490 F.2d 1255, 1261 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974). Although this consideration alone may not always warrant refusal to designate a class, compare, e. g., *Cicero v. Olgiati,* 410 F.Supp. 1080, 1099, n. 8 (S.D.N.Y.1976); *Percy v. Brennan,* 384 F.Supp. 800, 811 (S.D.N.Y.1947), such a result is appropriate here. As in *Galvan* there is substantial assurance that the defendants will respect an adverse determination and consider themselves bound by it with regard to the general application of the statute or practice under attack. The INS has already ceased Area Control operations in which persons suspected of being aliens are stopped and interrogated solely on the basis of an agent's on-the-spot observations. The practice was discontinued in the New York District in June, 1973, on orders from the defendant Maurice Kiley, the Director of the New York District, and nationally in October, 1973. (Tr. 259–67) Kiley directed that investigators no longer engage in street encounters absent specific information about a particular individual and other-

---

**8.** Ms. Flores and Mr. Marquez both testified that Ms. Flores was in the car for almost 15 minutes and let out at 60th Street and 4th Avenue, some twenty blocks from where they were taken into custody. (Tr. 18; 83) Mrs. Flores accuses the investigators of gratuitous harassment, having caused her to have to walk over a mile to work in the cold weather and lose an hour's wages for being late. We credit the testimony of Weiss and Carroll that they released Ms. Flores much nearer to the place she was picked up, after only six or seven minutes. (Tr. 135; 205–06) Moreover, even assuming, arguendo, that in testifying the investigators minimized the distance somewhat, there is no basis in the record to infer intent to aggravate Ms. Flores, who gave no indication to the investigators that the location of her release would create a problem for her. (Tr. 85–86) At worst the investigators may have been less than entirely thoughtful or considerate.

**9.** Although the complaint indicates the plaintiffs' intention to bring this suit as a class action and contains the necessary allegations, the plaintiffs neglected to move for class action certification as required by Local Civil Rule 11A(c). (Neither did the government move to dismiss the class allegations under Local Civil Rule 11A(d).) The issue was raised for the first time at the opening of the trial and briefed only in the post-trial memoranda. At trial the government opposed designation of a class. It indicated that until shortly before trial and on the basis of discussions with plaintiffs' counsel, it had understood the case to be strictly for damages by the three named plaintiffs. Despite the apparent infraction of the Local Rules of Civil Procedure, the tardiness of the application alone would not appear to be grounds to deny class certification. Such action is permissible even after trial on the merits. *Senter v. General Motors Corp.,* 532 F.2d 511, 520–22 (6th Cir. 1976); *Castro v. Beecher,* 459 F.2d 725, 731–32 (1st Cir. 1972). And see *Jimenez v. Weinberger,* 523 F.2d 689, 697–99 (7th Cir. 1976) (class certified on remand from Supreme Court reversal of judgment for defendants).

wise confine themselves to following specific leads and complaints, concentrating their efforts on industrial operations suspected of hiring large numbers of illegal aliens. The memorandum in which the national policy was announced [10] suggests that the decision was in substantial part a responsible reaction to the decision of the District Court in *Illinois Migrant Council v. Pilliod*, 398 F.Supp. 882 (N.D.Ill.1975) *aff'd as modified*, 540 F.2d 1062 (7th Cir. 1976), and *Order Upon Rehearing In Banc of January 26, 1977*, discussed *below* at 111–113.

It is true that these policy changes do not necessarily meet all of the plaintiffs' constitutional objections, there being no express requirement that suspicion of *illegal* alienage is a necessary prerequisite to questioning. It is also true that the INS action was strictly voluntary with regard to those aliens outside the class designation in *Illinois Migrant Council*, and its position as expressed at trial is still that such procedures are constitutional as authorized by the face of the statute.[11] The agency's response to the *Illinois Migrant Council* de-

cision, however, as well as its response to less formal criticism in the past,[12] provide every reason to expect that an adverse decision in this case will be respected. In any event, the judgment may be worded to insure this result and thereby accomplish the same effect as would class certification. See *Galvan v. Levine, supra.* Similarly, this fact obviates the risk of inconsistent adjudications at which Fed.R.Civ.P. 23(b)(1)(A) is directed.

For these reasons, aggravated by the plaintiffs' lack of diligence in raising the issue, the motion to certify the class is denied.

### 2. The Merits

Plaintiffs place principal reliance in their claim for declaratory and injunctive relief on the Supreme Court's decision in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The petitioner in *Brignoni-Ponce* had been convicted of the knowing transportation of illegal immigrants. He was arrested when the car in

---

**10.** The national policy was announced in an INS newsletter dated October 3, 1975, which stated, in relevant part:

> "*Area Control Operations*—On September 11, new guidelines were furnished field offices on area control operations. Under a preliminary injunction issued on July 29, in the U.S. District Court for the Northern District of Illinois, INS officers in that district are restrained until further order of the Court, from entering certain dwellings occupied by persons of Mexican ancestry or Spanish surname unless in possession of a valid warrant, or have probable cause to enter without such warrant, or have received permission voluntarily given by one lawfully entitled to give such permission to enter. Also, they are restrained from arresting, detaining, stopping, interrogating or otherwise interfering with any person of Mexican ancestry or Spanish surname without a valid warrant to search or arrest such person, or have probable cause to search or arrest such person without a warrant, or have reasonable suspicion based on specific articulable facts that such person is an illegal alien.
> *In other areas of the country, area control operations must be limited to the working of specific complaints and leads. An exception may be made when a suspect alien is observed on the street. He may be questioned provided the officer can state that questioning was on the basis of specific articulable*

*facts, and must be based upon more than skin color.*

> \* \* \* \* \* \*

Articulable facts may include demeanor, behavior, nervousness, speech, dress, etc. Our officers must bear in mind, however, that physical appearance alone is not sufficient to stop and interrogate an individual." (Emphasis supplied.)

The language setting forth the new policy is, on its face, susceptible of interpretation as a restatement of prior INS policy. However, Kiley testified that he understands this directive to be coextensive with his own policy in the New York District, see text above, which is markedly more restrictive. (Tr. 262)

**11.** The agency's position that Area Control Operations as previously conducted are constitutional, the fact that it could at any time revert to the prior policy, and the failure of the new policy specifically to require suspicion of illegal alienage, prevent this aspect of the case from being moot.

**12.** Kiley testified that in 1972, in response to complaints by unnamed civic organizations and citizens groups about a controversial subway investigations program which was being conducted in the New York District, the agency discontinued the practice. (Tr. 267).

which he was transporting two illegal aliens was stopped near the Mexican border by agents of the Border Patrol on "roving patrol" because of the Mexican appearance of the car's occupants. The government contended that this was sufficient grounds to suspect alienage and justify an inquiry under § 287(a)(1). The Court of Appeals reversed the District Court's denial of a motion to suppress testimony of and about the two aliens. The Supreme Court affirmed. Recognizing that a brief investigatory stop is less intrusive on the privacy of a traveler than a vehicular search, the Court held that probable cause was not required. Compare *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). It did, however, limit the authority of an immigration official to make even a brief investigatory stop of a moving vehicle to situations where the "officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country." 422 U.S. at 881, 95 S.Ct. at 2580. The Court summarized:

> "The effect of our decision is to limit exercise of the authority granted by . . . § 287(a)(1) . . . . Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.[9]" 422 U.S. at 884, 95 S.Ct. at 2582.

In footnote nine, the Court stated:

> "As noted above, we reserve the question whether Border Patrol officers also may stop persons reasonably believed to be aliens where there is no reason to believe they are illegally in the country. *See Cheung Tin Wong v. INS,* 152 U.S.

App.D.C. 66, 468 F.2d 1123 (1972); *Au Yi Lau v. INS,* 144 U.S.App.D.C. 147, 445 F.2d 217, *cert. denied,* 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971). The facts of this case do not require decision on the point.

This, of course, is precisely the issue raised by the plaintiffs in the instant case.

Plaintiffs argue that after *Brignoni-Ponce,* only persons reasonably suspected of being unlawfully in the country may be stopped for inquiry under § 287(a)(1) and that suspicion of alienage alone is insufficient to justify an interrogatory stop.[13] This was the conclusion of the District Court in *Illinois Migrant Council v. Pilliod, supra,* 398 F.Supp. 882. Like the case at bar, *Pilliod* was a civil suit for declaratory and injunctive relief which challenged, *inter alia,* the INS area control operations practice of stopping suspected foreign pedestrians pursuant to § 287(a)(1). In that case there were three separate stops involving four individuals, two of whom were American citizens and two permanent resident aliens. All four stops were based solely on the foreign appearance of the persons involved. 398 F.Supp. 893. The court viewed the fact that the plaintiffs had been stopped on foot as the only arguable basis for distinguishing *Brignoni-Ponce,* where the petitioner was stopped while driving a vehicle. Referring to case law developed in other contexts which relaxes somewhat the Fourth Amendment standards regarding the search of vehicles,[14] the court reasoned that "it would be anomalous to guarantee the automobile driver greater freedom of movement than that afforded the pedestrian." 398 F.Supp. 898. Accordingly, the court enjoined the INS from conducting investigatory stops under § 287(a)(1) on less than reasonable suspicion of illegal alienage.[15]

---

**13.** Plaintiffs dismiss footnote 9 in *Brignoni-Ponce* as reflecting an "excess of caution." Post Trial Memorandum at 3.

**14.** *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

**15.** The exact terms of the District Court injunction are set out in the opinion of the Court of Appeals in the same case. The INS was enjoined from:

> "arresting, detaining, stopping, and interrogating or otherwise interfering with plaintiffs or any person of Mexican ancestry or of a

The District Court's decision in *Pilliod,* however, was modified on appeal. *Illinois Migrant Council v. Pilliod, supra,* 540 F.2d 1062 (7th Cir. 1976). The appellate court agreed on the facts of that case the stops involved were illegal, since they were founded exclusively on the foreign appearance of the individuals involved and, impliedly, since they were somewhat detentive in nature. 540 F.2d 1070. But it made plain that on different facts, if an INS officer approached a person suspected of alienage and casually inquired into the person's citizenship with no threat of detention, it would reach a different result. In short, the court ruled that so long as the queried person voluntarily submits to questioning, it is lawful for an INS officer to approach on reasonable suspicion of alienage alone, but that a *detention* for questioning, however brief, requires reasonable suspicion of unlawful presence in the United States. 540 F.2d 1062, 1069–71 & n. 10. And see *id.,* 540 F.2d 1076–77 (Tone, J., dissenting). The District Court's injunction was subsequently modified accordingly by an unpublished Order Upon Rehearing in Banc, dated January 26, 1977:

". . . to prohibit an agent who does not have a belief, based on specific articulate facts, that a person he wishes to interrogate is illegally in the United States, from detaining that person by force, threat of force or a command based on the agent's official authority, *but not prohibiting the agent from questioning that person, without such detention, concerning his right to be in the United States, if the agent reasonably believes the person to be an alien.*" (Emphasis supplied)

In taking this approach the Court of Appeals in *Pilliod* adopts the analysis of a series of earlier decisions in the Court of Appeals for the District of Columbia, *Cheung Tin Wong v. INS, supra,* 468 F.2d 1123; *Au Yi Lau v. INS, supra,* 445 F.2d 217; *Yam Sang Kwai v. INS,* 133 U.S.App. D.C. 369, 411 F.2d 683 (1969), *cert. denied,* 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1970), and incorporated into the INS training manuals discussed *supra* at 8–11. And see *Shu Fuk Cheung v. INS,* 476 F.2d 1180 (8th Cir. 1973) (adopting constitutional analysis of the D.C. Circuit cases).[16] These are the cases to which the Supreme Court alluded in footnote nine of *Brignoni-Ponce, supra.* They articulate the standard advocated by the government in the instant case.

The controversy thus reduces to a conflict between two views of the constitutionally permissible scope of authority vested by § 287(a)(1) which, theoretically at least, vary only to a subtle degree. The government does not dispute that reasonable suspicion of unlawful alienage is necessary to an investigative detention. It argues only that casual questioning upon suspicion of alienage alone, where a "suspect" alien is free to cooperate or not, is well within the principles which underly the Supreme Court decisions.

This interpretation is not necessarily inconsistent with *Brignoni-Ponce,* since it could well be argued that the stop of a vehicle is inherently more detentive in nature than a casual approach to a pedestrian. (See *Illinois Migrant Council v. Pilliod, supra,* 540 F.2d 1076, Tone, J., dissenting.) It is not possible for an officer "casually" to inquire into the alienage of an individual in a moving vehicle, or into his willingness to discuss the matter, without first ordering

---

Spanish surname [in the Northern District of Illinois], unless they possess a valid warrant . . . , [or have probable cause], *or have reasonable suspicion based on specific articulable facts that such person is an alien unlawfully in the United States." Illinois Migrant Council v. Pilliod, supra,* 540 F.2d at 1067.

**16.** The Second Circuit has not had occasion to rule on the issue. There is *dicta* in *Ojeda-Vinales v. INS,* 2 Cir., 523 F.2d 286 (1975), which

suggests that reasonable suspicion of alienage is in some circumstances enough to warrant questioning. 523 F.2d at 288. However, in marked contrast to the instant case, the investigation in *Ojeda-Vinales* was based on a specific lead provided to the INS, and the individual was not questioned until several articulable facts pointed to possible alienage. The case thus sheds little light on the problem presented in the instant dispute.

the vehicle to come to a halt. In that situation the suspect is in a very real sense "detained" within the confines of his car. But see *Cheung Tin Wang v. INS, supra,* 468 F.2d at 1124–25. On the other hand, plaintiffs' view also finds support in *Brignoni-Ponce.* Since in that case the stop was not even founded on a reasonable suspicion of alienage, the decision could have rested on that ground alone. The court went on, however, to hold that at least where vehicular stops are concerned, agents must reasonably suspect *illegal* alienage.

■ Proper resolution of the issue hinges on the appropriate balance to be struck "between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce, supra,* 422 U.S. at 878, 95 S.Ct. at 2578. *Brignoni-Ponce* is just one of a series of recent decisions in which the Supreme Court has made clear that the public interest involved here, control of a tremendous influx of aliens who have entered the country illegally, is of high importance. *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *Almeida-Sanchez v. United States, supra,* 413 U.S. 266, 93 S.Ct. 2535 (1973). On the other hand, there can be little doubt of the strong public interest in the protection of citizens from campaigns by law enforcement officials, such as the area control operations in which Weiss and Carroll were engaged in this case, which entail random interference with their daily travel, whether in automobiles or on foot, and questioning in regard to their national origins and citizenship status. This is especially so in view of the dominant role which physical or racial appearance inevitably plays in the officers' decision to stop and inquire, a factor which adds significant Fourteenth Amendment overtones to what is essentially a Fourth Amendment problem. The importance of these private interests is implicitly recognized in the *Brignoni-Ponce* decision, where the court adopted the stricter of two standards despite its express conclusion that the intrusion involved in brief ques-

tioning pursuant to § 287(a) is "modest." 422 U.S. at 880, 95 S.Ct. 2574.

■ To the extent that the distinction between casual inquiries and detentive stops is, or can be, strictly observed, there is a good deal of support for the rule urged here by the government. Given the plenary power of Congress to regulate the entrance and presence of aliens within the United States, there is nothing objectionable in the proposition that aliens should from time to time be subject to inquiry by INS officials. See *United States v. Brignoni-Ponce, supra,* 422 U.S. at 883–84, 95 S.Ct. 2574. As the Supreme Court has noted this consideration deals with only part of the problem, since it fails to address the question of citizens who may appear to be aliens and consequently be subjected to questioning. *Id.* Citizens, however, are not constitutionally protected from having questions addressed to them by law enforcement officers or, indeed, by any other citizen, in public places. *Terry v. Ohio,* 392 U.S. 1, 32–33, 34, 88 S.Ct. 1868, 20 L.Ed.2d 889 (Harlan and White, JJ., concurring separately). Where the right of the person queried to respond or not is fully respected and no adverse inferences are drawn from a decision not to reply, there would appear to be no seizure within the meaning of the Fourth Amendment.

■ However, whatever theoretical appeal there may be to a rule which permits casual, voluntary questions upon suspicion of alienage alone, but requires suspicion of illegality for detention, is in our view substantially undermined by the realities of the matter. It is in the nature of an oxymoron to speak of "casual" inquiry between a government official, armed with a badge and a gun and charged with enforcing the nation's immigration laws, and a person suspected of alienage. This is particularly so in the context of area control operations as described at trial. In such situations a suspect alien is suddenly confronted by INS officers who have just driven up in an automobile, left the car and directly approached, and immediately queried as to his nationality. For a constitutional rule in these mat-

ters to depend on the "voluntary cooperation" of the suspect is to impose a gloss upon real life. When it is further considered that refusal to cooperate or an attempt to evade such a "casual encounter," indeed, even the appearance of nervousness, may well be held to provide reasonable grounds to suspect unlawful presence and therefore to authorize forcible detention, see, e. g., *Au Yi Lau v. INS, supra*, 445 F.2d at 220; cf. *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977) (and cases cited there), the rule urged upon us by the government appears unworkable. Although application of the Fourth Amendment requires courts at times to develop artificial constructs which can never precisely conform to the fluid and infinitely various nature of contacts between government officers and the populace, in formulating such rules a court should not ignore the realities of everyday life.

■ Recognizing that the issue is not free from doubt, we conclude that at least with regard to the kind of area control practices at issue in this case, the more restrictive view reflects the appropriate balance between the conflicting demands of the Fourth Amendment and the government's very legitimate need to control the problem of illegal aliens. The limit on its discretion urged upon us by the government is too weak a reed to lean on. Although in Part II.A.1., *supra*, we found that Investigators Weiss and Carroll had a good faith suspicion of plaintiffs' alienage on the basis of racial and non-racial criteria emphasized in their training, we have serious doubts whether, in the context of random area control campaigns directed at pedestrian traffic, such determinations are or can be made except with undue reference to racial, and hence, impermissible, grounds. The possibilities of harassment or abuse if INS officers are permitted in this manner to query pedestrians in cosmopolitan areas teaming with individuals of every conceivable race and origin are rife. See, e. g., *Illinois Migrant Council v. Pilliod, supra*, 398 F.Supp. 886–90. The spectre of INS investigators cruising through neighborhoods where large numbers of foreign-born

people are known to reside and work in search of people who "look like" aliens, engaging many, if not most, in detentive stops and transporting to INS headquarters those who cannot provide on-the-spot documentation of various personal circumstances, is fundamentally offensive to this nation's historical concepts of proper law enforcement techniques. That many of those ultimately arrested may prove to be aliens subject to deportation proceedings does not render the technique any the less odious. The fact that the INS has voluntarily discontinued the practice in favor of working on the basis of specific leads, a tactic fully compatible with more usual police methods, strongly suggests that these area control operations are by no means an indispensible tool in the performance of the agency's task.

■ For the foregoing reasons, the plaintiffs are entitled to a declaratory judgment that in the conduct of area control operations such as those here at issue, INS officials may approach persons to inquire into their citizenship status only on a reasonable suspicion based on specific articulable facts, that the person may be an alien who is illegally in the country. Given the present dormant status of these area control operations, there is no basis for a grant of injunctive relief.

Submit judgments on notice.