590 F.2d 497
 Shan Gan LEE, a/k/a Shin Kan Li, Ank-abc-txh, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 77-2265.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 5, 1978.
Decided Jan. 4, 1979.
As Amended Jan. 25, 1979.
 
 Abraham Lebenkoff, Jules E. Coven, Lebenkoff & Coven, New York City, for petitioner.
 Philip Wilens, Chief, Government Regulations and Labor Section, Crim. Div., James P. Morris, Chester J. Halicki, Attys., Dept. of Justice, Washington, D. C., for respondent.
 Before SEITZ, Chief Judge, HUNTER, Circuit Judge, and CAHN,* District Judge.OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Petitioner, Shan Gan Lee, a/k/a Shin Kan Li, seeks review of an order of the Board of Immigration Appeals, pursuant to section 106 of the Immigration and Nationality Act, 8 U.S.C. § 1105a. The petitioner challenges the Board's affirmance of an Immigration Judge's finding that he was deportable as a crewman deserter under section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2). He claims that evidence introduced during the deportation proceedings should have been suppressed as the fruits of an illegal interrogation and arrest.
 
 I.
 
 2
 Petitioner was arrested by John Hughes, a Criminal Investigator with the Immigration and Naturalization Service (hereinafter INS) in Freehold, New Jersey, on June 7, 1976. Following that arrest Hughes escorted Lee to the INS District Office in Newark, New Jersey, where he was served with a warrant for his arrest and an order to appear for a hearing before an Immigration Judge to show cause why he should not be deported. The hearing took place on July 30, 1976.
 
 
 3
 At that hearing petitioner was represented by counsel, who advised him to refuse to answer any questions based on his fifth amendment privilege against self-incrimination. As a result, Lee did not testify during that portion of the hearing relating to the charge that he was deportable, although he did testify in support of his application for a grant of voluntary departure.
 
 
 4
 The evidence introduced by counsel for the INS consisted of the aforementioned order to show cause, a crewman's landing permit, and the testimony of Investigator Hughes. The permit had been issued by an Immigration Officer at Wilmington, North Carolina, on March 8, 1976, to one Shin Kan Li, a native of the Republic of China. It authorized said crewman's stay in this country only until the next sailing of his vessel, and in no event beyond 29 days.
 
 
 5
 Petitioner's counsel asked the Immigration Judge to suppress the crewman's landing permit because it had been illegally obtained by the INS. The Judge delayed ruling on that motion until he learned the circumstances surrounding the INS's acquisition of the permit through the testimony of Investigator Hughes.
 
 
 6
 Hughes testified at the deportation hearing that he apprehended Lee in Freehold, New Jersey, on June 7, 1976. Hughes had been returning from an unrelated assignment in the vicinity when he stopped at a store in a shopping plaza to purchase some cough drops. As he was returning to his car he noticed two men walking across the parking lot in the direction of an adjacent shopping center. A restaurant called the China Inn was located within that adjacent shopping center, and Hughes knew, from prior experience, that the China Inn had employed illegal aliens in the past. The two men caught his attention because they were speaking in Chinese. Hughes noted that each man was dressed in a white shirt, of the type normally worn by kitchen help in restaurants. Based on these observations, Hughes approached the men, identified himself as an Immigration Officer, and proceeded to question them about their alienage.
 
 
 7
 Hughes testified that one of the two men immediately informed him, in English, that he was a refugee and presented a passport. Meanwhile, Lee appeared to Hughes to be very nervous and during Hughes' conservation with the other man Lee, without speaking, started to walk away. At that point Hughes told Lee to wait a minute or to stop and asked him what his status was in the United States. When Lee replied that he was a lawful permanent resident, Hughes asked to see his "green card." Lee answered that he didn't have one, and Hughes countered by stating that without such a card Lee could not be a lawful permanent resident. At that, Lee immediately stated that he had entered the United States as a crewman and that he had deserted his ship. Lee then produced from his wallet the crewman's landing permit introduced by the INS at the hearing and gave it to Hughes. Hughes then placed Lee under arrest, advised him of his rights and transported him to the INS District Office in Newark.
 
 
 8
 On cross-examination, counsel for petitioner questioned Hughes at length concerning the factors that had led him to believe there was "probable cause" to question Lee and his companion. Hughes reiterated that it was the combination of the two men's conversation in Chinese, their dress in garb normally worn by restaurant personnel and their walking in the direction of the China Inn that caused him to approach them for questioning. He stated that Lee's nervous appearance and the fact that he attempted to walk away, in contrast to the other man's actions in freely conversing with Hughes, further aroused his suspicions. Hughes testified that it was then merely a matter of moments from the time he asked Lee to stop until the time he recanted his initial story that he was a lawful permanent resident and admitted that he had jumped ship. Hughes repeatedly denied that it was the Oriental appearance of the two men alone that had led him to commence the questioning that led to Lee's arrest.
 
 
 9
 The Immigration Judge adopted Hughes' uncontradicted version of the facts and entered an oral decision in which he held that petitioner's arrest had been properly executed. He characterized Hughes' initial stop of Lee as a "forcible detention of a temporary nature for purposes of interrogation under circumstances arising creating a reasonable suspicion, not arising to a level of probable cause to arrest, that the individual so detained is illegally in this country." The Judge found that the crewman's landing permit, given Lee's failure to deny that it related to him or to otherwise explain his presence in this country, established by clear, convincing and unequivocal evidence that he was deportable as an alien illegally present in the United States. The Judge also denied petitioner's application for voluntary departure after having heard Lee's testimony that deportation would adversely affect his ability to continue working as a crewman and that he did not deliberately leave his ship with the intention of staying in the United States, but rather got lost and missed his ship's sailing date.
 
 
 10
 Petitioner appealed both aspects of the Judge's order to the Board of Immigration Appeals and the Board issued its opinion, after hearing oral argument, on August 22, 1977. The Board agreed with the Judge's finding as to the legality of Lee's interrogation and arrest under sections 287(a)(1) and (2) of the Immigration and Nationality Act, 8 U.S.C. §§ 1357(a)(1) & (2), and with his finding that the landing permit conclusively established Lee's deportability. However, the Board decided to grant Lee's request that he be permitted to depart the United States voluntarily.
 
 
 11
 Petitioner asks this Court to reverse the Board's finding of deportability, remand this case for a new hearing and order that the landing permit and Lee's statements to Hughes be suppressed at that hearing. The INS contends that there was no impropriety in Hughes' interrogation and arrest of Lee, and assuming that the arrest was illegal, that the exclusionary rule should not be applied in deportation proceedings.
 
 II.
 
 12
 Congress has granted officers of the INS certain powers to assist them in enforcing conditions on illegal alien entry. Among those powers are the grants of authority set forth in sections 287(a)(1) and (2) of the Immigration and Nationality Act, 8 U.S.C. §§ 1357(a)(1) & (2). Section 287(a)(1) authorizes INS officers, without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States." Section 287(a)(2) authorizes an officer, without warrant, "to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation (regulating the admission, exclusion or expulsion of aliens) and is likely to escape before a warrant can be obtained for his arrest."
 
 
 13
 In construing these statutory provisions courts have held that INS officers are limited by the fourth amendment in exercising the powers conferred upon them by Congress. Thus, it has been held that the statutory requirement that an officer have "reason to believe" a person is an illegal alien before he may arrest him without a warrant must be interpreted as coterminous with the fourth amendment's requirement of probable cause. See Ojeda-Vinales v. Immigration & Naturalization Service, 523 F.2d 286, 287-88 (2d Cir. 1975); Au Yi Lau v. United States Immigration & Naturalization Service, 144 U.S.App.D.C. 147, 152, 445 F.2d 217, 222, Cert. denied, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971). The challenge raised by Lee in this petition for review, however, focuses not on the legality of his arrest but on the alleged impropriety of his interrogation by Investigator Hughes. This is not surprising given that Hughes did not arrest Lee until he had admitted that he had jumped ship and had presented to Hughes his expired landing permit. It cannot be controverted that after that admission Hughes had probable cause to arrest Lee as an illegal alien and reason to believe that Lee would be likely to escape if he was not taken into custody.
 
 
 14
 This petition for review focuses then on section 287(a)(1) of the Act, which permits officers of the INS to interrogate any person believed to be an alien as to his right to be or to remain in this country. The scope of that grant of authority has also been held to be limited by the strictures of the fourth amendment. In United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975), the Supreme Court held that "the Fourth Amendment . . . forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." Brignoni-Ponce was a case arising from the criminal prosecution of an individual charged with knowingly transporting illegal immigrants across the Mexican border. The Government relied, in part, on the statutory grant of authority in § 287(a)(1) as justification for the Border Patrol's stop of an automobile in order to question its occupants about their citizenship status. The Supreme Court made it clear that the effect of its decision that the stop violated the fourth amendment was to limit the exercise of authority granted by § 287(a)(1), stating that "officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." 422 U.S. at 884, 95 S.Ct. at 2582 (footnote omitted). The Court reserved the question whether officers also may stop persons reasonably believed to be aliens when there is no reason to believe they are illegally in the country. Id. 884 n.9, 95 S.Ct. 2574.
 
 
 15
 Courts, both before and since the decision in Brignoni-Ponce, have applied fourth amendment limitations to § 287(a)(1) in cases outside the context of an interrogation pursuant to a vehicular stop. In Au Yi Lau, supra, 144 U.S.App.D.C. at 152-53, 445 F.2d at 222-23, the District of Columbia Circuit adopted a distinction between an officer's mere questioning of a cooperative individual and an officer's detention of an individual, against his will, for the purpose of questioning. Although the court found both types of questioning authorized by § 287(a)(1), it held that the fourth amendment required that forcible detention of a temporary nature for the purposes of interrogation required an officer to have "a reasonable suspicion, not arising to the level of probable cause to arrest, that the individual so detained is illegally in this country," while mere questioning alone required only that the officer have reason to believe that the individual was of alien origin.
 
 
 16
 The distinction drawn in Au Yi Lau was further refined by the same court's opinion in Cheung Tin Wong v. United States Immigration & Naturalization Service, 152 U.S.App.D.C. 66, 468 F.2d 1123 (1972). There the court was asked to find that an INS investigator had transgressed fourth amendment limitations in apprehending the petitioner, an alien crewman who had jumped ship. The investigator had observed, from his moving car, two men of Chinese appearance, one of whom was wearing a white shirt described as being of the type worn by busboys, walking along the sidewalk in the vicinity of a shopping center whose establishments included a Chinese restaurant. After passing the two men, the investigator, watching them through his rearview mirror, saw them hail a taxi, saw the petitioner enter the cab and noticed that his companion gave instructions to the driver. Concluding that the petitioner could not speak English, the investigator made a U-turn and caught the cab at a traffic light. He identified himself to the driver as an INS officer, asked the driver to remain stopped and began questioning the petitioner. 152 U.S.App.D.C. at 67-68, 468 F.2d at 1124-25.
 
 
 17
 Recognizing that the Au Yi Lau formulation had been based on an analogy to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the court turned to the later elaboration of the Terry doctrine in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), for guidance. 152 U.S.App.D.C. at 70, 468 F.2d at 1127. In Adams the Supreme Court recognized the possibility that "(a) brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." 407 U.S. at 146, 92 S.Ct. at 1923. The Cheung Tin Wong court concluded that whether the INS investigator's actions in that case were characterized as "mere questioning" or a "brief stop of a suspicious individual . . ." they should be tested according to the standard of whether he had a reasonable suspicion that the petitioner was an alien at the time he stopped the taxi. The court found that the investigator's actions had been justified under that standard. 152 U.S.App.D.C. 70-71, 468 F.2d at 1127-28. See also Au Yi Lau, supra, 144 U.S.App.D.C. at 153-54, 445 F.2d at 223-24 (recognizing that one accosted in apparent attempt to avoid being questioned was not clearly detained against his will when he thereafter readily acquiesced in the investigator's interrogation). The principles articulated in Au Yi Lau and Cheung Tin Wong were adopted by the Eighth Circuit in Shu Fuk Cheung v. Immigration & Naturalization Service, 476 F.2d 1180 (8th Cir. 1973).
 
 
 18
 Subsequent to the Supreme Court's decision in Brignoni-Ponce, two courts of appeals have formulated standards governing interrogations under § 287(a)(1). The Second Circuit has approved the formulation in Au Yi Lau that "permits I.N.S. officers to interrogate and temporarily detain an alien upon 'circumstances creating a reasonable suspicion, not arising to the level of probable cause to arrest, that the individual so detained is illegally in this country.' " Ojeda-Vinales, supra, 523 F.2d at 287. The Seventh Circuit, in modifying a preliminary injunction entered against the INS in a civil suit, tracked the language of both Brignoni-Ponce and Au Yi Lau and prohibited an agent
 
 
 19
 who does not have a belief, based on specific articulable facts, that a person he wishes to interrogate is illegally in the United States, from detaining that person by force, threat of force, or a command based on the agent's official authority, but not prohibiting the agent from questioning that person, without such detention, concerning his right to be in the United States, if the agent reasonably believes the person to be an alien.
 
 
 20
 Illinois Migrant Council v. Pilliod, 548 F.2d 715, 715 (7th Cir. 1977) (order entered upon rehearing in banc), Modifying, 540 F.2d 1062 (7th Cir. 1976).
 
 III.
 
 21
 Two troubling issues have been left largely unresolved by the opinions written in this area. The first concerns the question raised in Au Yi Lau and Cheung Tin Wong about the factual distinction between a temporary forcible detention, requiring that the investigator have a reasonable suspicion that the detainee is an illegal alien, and what has sometimes been characterized as "casual conversation" or "mere questioning," requiring only that the investigator have a reasonable belief that the person questioned is an alien. See Marquez v. Kiley, 436 F.Supp. 100, 113-14 (S.D.N.Y.1977) (finding that distinction to be unworkable and, therefore, granting a request for a declaratory judgment that INS officials may approach a person for questioning only on a reasonable suspicion that he may be an alien who is illegally in this country).
 
 
 22
 The second issue concerns the question whether an INS officer who legitimately approaches a person for questioning, based on a reasonable belief that he is an alien, may take into account that person's nervousness or his reluctance to cooperate as factors contributing to a reasonable belief that he is an illegal alien, thereby justifying some form of forcible detention. See Illinois Migrant Council v. Pilliod, supra, 540 F.2d at 1070 n.10 (majority panel opinion); Id. 1077 n.15 (Tone, J., dissenting); Marquez v. Kiley, supra, 436 F.Supp. at 114.
 
 
 23
 We believe that the issues presented by this case may best be resolved by considering whether Investigator Hughes' stop and interrogation of Lee were " 'reasonably related in scope to the justification for their initiation.' " Brignoni-Ponce, supra, 422 U.S. at 881, 95 S.Ct. at 2580, Quoting Terry v. Ohio, supra, 392 U.S. at 29, 88 S.Ct. 1868. In doing so we are less concerned with whether one might characterize Hughes' encounter with Lee as a "temporary forcible detention" or "mere questioning" than with whether the circumstances he described in his testimony "pass the threshold of reasonable suspicion necessary to justify the stop which was made in this case . . . ." United States v. Oates, 560 F.2d 45, 61 (2d Cir. 1977).
 
 
 24
 As set forth above, Hughes relied on several factors in deciding to approach Lee and his companion for interrogation. We believe that those factors, taken in combination, justified at least a reasonable suspicion that the two men were aliens. Furthermore, those factors, the men's conversation in Chinese, their mode of dress and their proximity to the China Inn, a known employer of illegal aliens in the past, aroused an initial suspicion in Hughes' mind that the two men might be illegal aliens employed at that restaurant. Lee's nervousness and his attempt to walk away from Hughes served to confirm that initial suspicion. Under such circumstances, we believe that Hughes adopted an appropriate "intermediate response" in asking Lee to stop and making a direct inquiry about his status in this country. See Brignoni-Ponce,supra, 422 U.S. at 881, 95 S.Ct. 2574, Quoting Adams v. Williams, supra, 407 U.S. at 145-46, 92 S.Ct. 1921. Lee made no further attempt to extricate himself from the conversation with Hughes; he was not physically detained from doing so. Rather, Lee immediately responded to Hughes' inquiry and subsequently admitted, after the exchange of only a few words, that he had entered this country as a crewman and had deserted from his ship.
 
 
 25
 We find that Hughes' actions were reasonable under the circumstances. He testified to the specific factors that caused him to develop a suspicion that Lee and his companion were aliens. His response to Lee's attempt to extricate himself from interrogation was reasonably related in scope to the justification he had for adopting that response.
 
 
 26
 Thus, we find that the crewman's landing permit that Lee voluntarily produced for Hughes' inspection, as well as Lee's statements to Hughes prior to the arrest, were not inadmissible at Lee's deportation hearing. Petitioner has raised no other challenge to the Board's finding that he was deportable as an alien illegally present in this country.
 
 IV.
 
 27
 Because we agree with the holding of the Board of Immigration Appeals that no evidence introduced at Lee's deportation hearing had been illegally obtained, we need not address the contention pressed here by INS that the exclusionary rule is not applicable to deportation proceedings. Nor does this petition require us to decide whether the INS, after discovering the identity of an illegal alien through an illegal interrogation and arrest, may then be barred from offering evidence obtained from its files to establish his deportability. See Hoonsilapa v. Immigration & Naturalization Service, 575 F.2d 735, 738 (9th Cir. 1978).
 
 V.
 
 28
 The petition for review of the order of the Board of Immigration Appeals will be denied.
 
 
 
 *
 The Honorable Edward N. Cahn, United States District Court Judge for the Eastern District of Pennsylvania, sitting by designation