Roman **BABULA**, Zdislaw **Drzymala**, **Abigniew Weszandize, Josef Pilat, Stanislaw Kowalczuk, Andrzej Lonc**, Petitioners,

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 80–2596.

United States Court of Appeals, Third Circuit.

Argued Sept. 18, 1981.

Decided Nov. 25, 1981.

Rehearing and Rehearing In Banc Denied Dec. 28, 1981.

Willard H. Myers, III (argued), Wasserman, Orlow, Ginsberg & Rubin, Philadelphia, Pa., for petitioners.

Lauri Steven Filppu, James A. Hunolt (argued), General Litigation and Legal Advice Section, Dept. of Justice, Washington, D.C., for respondent.

Before SEITZ, Chief Judge, and ADAMS and GARTH, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Six Polish nationals petition for review of an order of the Board of Immigration Appeals, holding them deportable for violating 8 U.S.C. § 1251(a)(2) & (9) (1976). This court has jurisdiction under 8 U.S.C. § 1105a (1976).

### I.

In late October, 1978, the Newark, New Jersey office of the Immigration and Naturalization Service (INS) received information from an unidentified source that H&H Industries of Pennsauken, New Jersey was employing illegal aliens. In early December, the Newark office received a memorandum, prepared four months earlier by the Philadelphia INS office, stating that a "reliable source" had informed the Philadelphia office H&H employed illegal aliens. The memorandum named seven Polish aliens and stated that the informant had said that H&H employed additional undocumented aliens, mostly Poles. Record checks by the Newark office in December revealed that six of the seven named aliens would not be subject to arrest and deportation. In early January an agent went to H&H to survey the site, principally to determine whether the INS could carry out an "area control operation." He determined that one would be feasible.

On February 1, 1979, six INS agents went to H&H to look for aliens in violation of their immigration status. Upon arrival at H&H at about 6:00 p. m., three agents remained at the exits to the factory to prevent anyone from leaving the factory. The other three agents entered the factory. Two of them spoke to the two persons in charge, the general manager, Elaine Morgandale, and the night foreman, Romuald

Harburda. The agents inquired about the seventh person on the list of names contained in the memorandum from the Philadelphia office. They found that that person had left H&H's employ more than a year before.

The three agents inside the factory then began interrogating the employees. The agents asked each employee in Polish whether he was a Polish national, had a green card, or had come to the United States on a tourist visa. Ten workers, including the six petitioners, were arrested and taken to the Newark INS office. There each petitioner was advised of his rights, and each signed a waiver of rights. Five petitioners made statements that were used to show deportability at the hearing before the immigration judge. Petitioner Kowalczuk did not make a statement, but after his arrest his father gave the INS agents Kowalczuk's passport and entry document, which were sufficient to prove Kowalczuk's deportability.

The immigration judge, after extensive hearings, issued deportation orders for the six petitioners. The Board of Immigration Appeals affirmed. This petition for review followed.

## II.

Petitioners raise four issues for review: (1) whether the agents violated their fourth amendment rights; (2) whether the agents violated 8 U.S.C. § 1357(a)(1) & (2) (1976), which limits the authority of INS agents to question and arrest suspected aliens; (3) whether the agents violated the INS's regulations, 8 C.F.R. § 287.3, 32 Fed.Reg. 6260 (April 21, 1967) (subsequently amended), which require certain warnings to be made to arrested aliens; and (4) whether the exclusionary rule should apply to deportation hearings.

## III.

Petitioners' claims under the fourth amendment and section 1357(a)(1) principally raise the issue of the reasonableness of the initial questioning of petitioners in the factory. The claims based on section 1357(a)(2) and section 287.3 principally raise the issue of the timing of petitioners' arrests.

### A.

■ The fourth amendment provides that, "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . ., ." The protections of the fourth amendment apply to seizures that do not amount to a traditional arrest. *See Terry v. Ohio*, 392 U.S. 1, 16–19 & n.15, 88 S.Ct. 1868, 1877–78 n.15, 20 L.Ed.2d 889 (1968). The constitutionality of such seizures depends upon "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Id.* at 19, 88 S.Ct. at 1878.

■ Eight U.S.C. § 1357(a)(1) provides that any INS agent may, without a warrant, "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." An INS agent's authority under § 1357(a)(1) to interrogate a person believed to be an alien is limited by the restrictions of the fourth amendment. *Lee v. INS*, 590 F.2d 497, 499–500 (3d Cir. 1979). In *Lee*, this court formulated the test that would be applied to challenges of power under section 1357(a)(1) as whether the questioned conduct was " ' "reasonably related in scope to the justification for [its] initiation." ' " *Id.* at 502 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (quoting *Terry v. Ohio*, 392 U.S. at 29, 88 S.Ct. at 1884)).

Since the same standards govern the validity of a seizure under section 1357(a)(1) as under the fourth amendment, questioning that is permissible under the fourth amendment is also permissible under section 1357(a)(1).

In *Lee*, an INS agent was walking to his car in a shopping plaza when he noticed two men speaking Chinese. They were walking towards an adjacent shopping center in

which there was a Chinese restaurant that the agent knew had employed illegal aliens in the past. Each man wore a white shirt of the type normally worn by kitchen employees. The court held that these observations were sufficient to raise a reasonable suspicion that the two men were aliens, and to raise an initial suspicion that they might be illegal aliens employed by the restaurant. 590 F.2d at 498, 502.

These suspicions justified the agent's approaching the two men and questioning them about their alienage. At this point there was no show of force other than that inherent in the agent's identification of himself as an immigration officer. While the agent questioned one of them, the other, Lee, became very nervous and started to walk away. This court held that Lee's conduct would justify the agent's reasonable suspicion that Lee was an illegal alien, and justify the agent's asking Lee to stop so the agent could ask a few questions. *Id.* at 502.

We believe that the conduct of the INS agents at H&H Industries, although not exactly analogous to the conduct of the agent in *Lee*, meets the standards set forth in *Lee*. The agent's observations in *Lee* justified the initial questioning because the agent reasonably believed (1) that the two men probably worked for an employer who the officer knew had employed illegal aliens in the past, and (2) that the two men were fluent in a language other than English, from which the agent could infer that they might not be native English speakers. The agents at H&H knew the following: (1) that all the persons in the factory definitely worked for an employer who an informant had stated employed illegal aliens, and (2) that the night foreman, Harburda, spoke English with difficulty, but spoke Polish fluently. Moreover, before conducting any questioning, the agents inquired about the one Polish alien that the informant had named and that the agents had reason to believe they could arrest. Elaine Morgandale told them that he was no longer employed at H&H, but had worked there previously. This information added credibility to the informant's assertion that H&H employed illegal aliens.

The primary factual difference between the suspicions that the agent in *Lee* had and the suspicions that the agents at H&H had is that the suspicions in *Lee* were based on observations of each person questioned, whereas in this case the agents had observed nothing specifically about each person questioned, but rather based their suspicions on the milieu in which the workers were found. We hold that the tip from a reliable source about the employment of illegal Polish aliens, combined with indicia that H&H did employ Polish aliens, are sufficient to justify the minimally intrusive questioning that the agents conducted. Although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure, [there is] no irreducible requirement of such suspicion." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560–61, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). Government agents may stop a vehicle "if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). Thus, persons in cars may be questioned about their alien status although there is no suspicion that a given individual is an alien. We think the questioning of petitioners was no more intrusive than such questioning of persons in a car would be.

The likelihood that individualized suspicion is not required is enhanced when "we deal neither with searches nor with the sanctity of private dwellings." *Martinez-Fuerte*, 428 U.S. at 561, 96 S.Ct. at 3084. Neither is at issue here. Additionally, police stops that are based on unconstrained discretion are less reasonable than methodical stops. *Cf. Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) (roadblocks legitimate where random stops would not be). The agents at H&H questioned all the employees rather than a

selection of them. Thus, although questioning without individualized suspicion raises serious constitutional concerns, we think that the facts of this case present one of the those instances when such questioning is permissible. Our holding does not imply any disagreement with *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1069–70 (7th Cir.), *modified en banc as to remedy only*, 548 F.2d 715 (7th Cir. 1976), that area control operations that involved late night warrantless searches of living quarters offended the fourth amendment's dictates. That issue is not presented here.

■ As the agents questioned employees, petitioners Babula and Weszandize attempted to flee. The agents inside the factory restrained them and asked about their alienage. The petitioners' conduct matched that of the petitioner in *Lee*, in which we held that nervousness and an attempt to flee justified a brief detention while the agent asked a few questions. Here, the aliens' attempted escape led the agents to believe reasonably that Babula and Weszandize were illegal aliens, and justified their brief restraint while the agents asked the three questions necessary to establish probable cause to arrest.

■ The parties dispute whether Morgandale or Harburda consented to the search for aliens. Neither the immigration judge nor the Board of Immigration Appeals resolved the factual conflict over whether actual consent had been given. We need not decide it either, because petitioners do not have standing to assert the fourth amendment rights of the factory owner. *See Illinois Migrant Council v. Pilliod*, 398 F.Supp. 882, 890, 900 (N.D.Ill.1975), *aff'd*, 540 F.2d 1062 (7th Cir.), *modified en banc as to remedy only*, 548 F.2d 715 (7th Cir. 1976). *Cf. Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (no fourth amendment right if no "legitimate expectation of privacy in the invaded place").

Thus, the agents did not violate any rights petitioners have under the fourth amendment or section 1357(a)(1).

### B.

■ Eight U.S.C. § 1357(a)(2) provides that any INS agent may, without a warrant, "arrest any alien in the United States, if he has reason to believe that the alien [is] in violation of any [law] or regulation [regarding the admission, exclusion, or expulsion of aliens] and is likely to escape before a warrant can be obtained...." At the time of petitioners' arrests, 8 C.F.R. § 287.3 provided in relevant part that:

> An alien arrested without warrant of arrest shall be advised of the reason for his arrest and his right to be represented by coun[sel] of his own choice, at no expense to the Government. He shall also be advised that any statement he makes may be used against him in a subsequent proceeding and that a decision will be made within 24 hours or less as to whether he will be continued in custody or released on bond or recognizance.[1]

32 Fed.Reg. 6260 (April 21, 1967). The agents did not give the section 287.3 warnings to petitioners until they arrived at the Newark office.

Petitioners contend that the agents arrested them at the time the agents surrounded the factory. If so, then the agents violated section 1357(a)(2) by arresting each petitioner without probable cause, and they violated section 287.3 by asking the three questions before the required warnings were given. Petitioners rely on *Yam Sang Kwai v. INS*, 411 F.2d 683 (D.C.Cir.) (opinion of Tamm, J.), *cert. denied*, 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1969), for the proposition that an arrest has both an objective and a subjective element: the police action must restrain the liberty of the arrested person to leave, and the arrested person must be aware that he cannot leave. *See* 411 F.2d at 686 (interpreting *Terry v.*

---

1. As currently amended, § 287.3 provides for the same warnings, but only after an examining officer has determined that deportation proceedings are warranted. 8 C.F.R. § 287.3 (1981).

*Ohio,* 392 U.S. at 19, 88 S.Ct. at 1878). Petitioners claim both elements were present at the time the agents surrounded the factory.

Petitioners' argument incorrectly relies on the *Yam Sang Kwai* test.[2] That test is applicable to defining what is a seizure for purposes of fourth amendment analysis rather than to defining what is an arrest for purposes of analysis under section 1357(a)(2) and section 287.3. *See* 411 F.2d at 687 (opinion of Tamm, J.) (fourth amendment must be complied with prior to time when probable cause to arrest exists); *id.* at 689 (McGowan, J., concurring in the result) (there is "important and discernible distinction between arrest on probable cause, and temporary detention for interrogation," although both are subject to fourth amendment).

We hold that under section 1357(a)(2) and section 287.3, "arrest" means an arrest upon probable cause, and not simply a detention for purposes of interrogation. Not only does this construction give "arrest" its normal meaning, but we believe that this is the only interpretation of that statute and regulation that makes sense. Otherwise, for example, the agent who arrested the petitioner in *Lee* would have violated both section 1357(a)(2) and section 287.3 when he started to ask questions, because, as subsequent events showed, Lee was not free to walk away. As we held in *Lee*, the agent's actions were subject to fourth amendment scrutiny at the point at which the agent first approached the aliens. However, Lee was not arrested until later, at the time when the agent had established probable

cause to arrest. *See* 590 F.2d at 500. The interpretation urged by petitioners would preclude INS agents from interrogating suspected aliens without arresting on probable cause.

We are aware that our holding that petitioners were not arrested until they answered the three questions effectively precludes any illegal alien subject to a similar area control operation from avoiding arrest. Whether or not the petitioners knew the agents had the building surrounded, it is quite clear that, once the building was surrounded, arrest was inevitable. Each petitioner could flee, as petitioners Babula and Weszandize did, but such action gives an agent a reasonable suspicion that justifies further detention. Each could answer the questions, as the other four petitioners did, thereby giving probable cause to arrest. Or each could remain silent and refuse to produce evidence of his identity, although this too would justify an agent's further suspicion of illegal alienage. *See Marquez v. Kiley,* 436 F.Supp. 100, 114 (S.D.N.Y.1977); *Illinois Migrant Council v. Pilliod,* 398 F.Supp. 882, 898 (N.D.Ill.1975), *aff'd,* 540 F.2d 1062 (7th Cir.), *modified en banc as to remedy only,* 548 F.2d 715 (7th Cir. 1976).

In short, although surrounding the factory and preventing any escape did lead to arrest, petitioners were not in fact arrested until they had answered the three questions, at which time the arresting agent had probable cause. No more questions were asked until the petitioners had been given the warnings of section 287.3. The agents detained all the persons in the factory for brief questioning, but the only persons ar-

---

2. Even if the *Yam Sang Kwai* test were applicable, petitioners would have failed to meet it, because they did not prove the subjective element. The Board of Immigration Appeals found that, "there is no evidence that any of the [petitioners] even knew the investigators were [positioned at the exits to the factory.]" Petitioners dispute this fact vigorously, but cite very little in support of their argument. We must accept the Board's findings of fact if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4) (1976); *see*

*Bastidas v. INS,* 609 F.2d 101, 104 (3d Cir. 1979). The finding that the petitioners were unaware that they were surrounded may be inferred from the fact that the agents who blocked the exits remained outside the factory. Petitioners rely on a statement by Harburda that the agent in charge told him to "make sure you tell your people nobody run, nobody can go outside, because we got five people from the Immigration Office cover up all doors." Harburda did not testify, however, that he actually told any employees that they were not free to leave.

rested were the ten whose answers to the questioning established probable cause to arrest.

Thus, we hold that the conduct of the agents violated no rights of the petitioners. Accordingly, we need not discuss the applicability of the exclusionary rule to deportation hearings.

## IV.

The Board of Immigration Appeals' order will be affirmed and the petition for review will be denied.

ADAMS, Circuit Judge, concurring.

I agree with the majority's judgment that these petitions for review should be denied. Unlike the majority, however, I would not decide the Fourth Amendment question that has been raised here by the petitioners, since I do not believe that such constitutional adjudication is necessary for the disposition of these appeals.[1]

The record reveals the following facts about the "area control operation" challenged by petitioners in this proceeding: Sometime in 1978, the Philadelphia office of the Immigration and Naturalization Service (INS) received "reliable" information that H&H Industries in Pennsauken, New Jersey, employed a number of aliens in violation of their immigration status. After a search of agency files identified one individual believed to be working illegally at H&H, an INS agent was dispatched to survey the facility and its surroundings. Subsequently during the early evening of February 1, 1979, six immigration inspectors visited the factory. Three inspectors remained at the plant's front entrance, apparently to question any individual who at-

tempted to leave. Two other agents went to the factory's main office, but were informed that the person they sought was no longer employed at H&H. Thus, at this point, the agents had no reason to know that any of the occupants of the factory were illegal aliens.

There is conflicting testimony whether the agents asked for or received permission to enter the factory area proper; it is undisputed, however, that they lacked warrants when they entered. The investigators were led into the work quarters by a Polish-speaking night supervisor. Once inside, they thoroughly searched the building. The agents, proceeding at random, either questioned or sought to question every employee present as to his or her nationality and immigration status. No warnings were given. Individuals who attempted to elude the investigators were restrained and then questioned. The ten employees—including the six petitioners here—who admitted to being Polish, with a tourist visa, and without a "green card," were taken into custody.

Were the story to end at this juncture, it would be necessary to determine whether the INS violated the Fourth Amendment in conducting this "area control operation." For the reason set forth below, however, I believe that such a determination in this case need not be made. Nonetheless, in light of the majority opinion, I am impelled to observe that I find the Fourth Amendment question considerably more troubling than do my colleagues.[2] In *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court held that the INS could not, consistent with the Constitution's prohibition of

---

1. *See Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 569, 67 S.Ct. 1409, 1419, 91 L.Ed. 1666 (1947) (constitutional pronouncements should not be rendered "in broader terms than are required by the precise facts to which the ruling is to be applied" or "if the record presents some other ground upon which the case may be disposed of").

2. Although the Supreme Court as of yet has not spoken definitively in this area, it would

appear that some degree of protection under the Fourth Amendment is afforded to aliens illegally present within the country, given that the very language of that Amendment speaks of "the right of the people" and not the rights of "citizens." *Cf. Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953).

unreasonable searches and seizures, deploy roving border patrols designed to stop vehicles randomly and question their occupants as to nationality. Writing for a unanimous Court, Justice Powell concluded that the Fourth Amendment "forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens," *id.* at 884, 95 S.Ct. at 2581–82.

It is arguable that the INS agents who conducted the H&H operation did not satisfy the *Brignoni-Ponce* standard. Certainly there is nothing in the record to indicate that, before each petitioner—or, for that matter, before any other employee—was questioned as to his status, the inquiring agent entertained a "reasonable suspicion" that the individual was an alien. On the contrary, the record indicates that, prior to its "raid," the INS knew only that *some* employees of H&H *might* have been illegal aliens; yet, the agents' instructions were to interrogate every employee in the factory.

The majority arrives at its result by referring to *Lee v. Immigration and Naturalization Service,* 590 F.2d 497 (3d Cir. 1979), and by declaring that "the conduct of the INS agents at H&H Industries, although not exactly analogous to the conduct of the agents in *Lee,* meets the standards set forth in *Lee.*" Majority opinion, typescript op. at 296. In *Lee,* however, the Court was careful to identify a number of "specific factors" that the INS agent relied upon in arriving at his "reasonable suspicion" that Lee was an alien. Those factors included not only the agent's pre-existing knowledge that a restaurant in the area had employed illegal aliens in the past, but also his detailed observations of the appearance, dress, language, and behavior of the suspect individual. 590 F.2d at 502. No such specific showing was made by the INS with respect to each petitioner questioned at H&H.

Primarily because broad-sweeping investigative procedures risk trenching upon the rights and liberties both of lawful aliens and of citizens, a number of courts have concluded that so-called "area control operations" similar to that conducted at H&H could not be reconciled with the commands of the Fourth Amendment. Thus, in *Illinois Migrant Council v. Pilliod,* 548 F.2d 715 (7th Cir. 1977) (in banc), *modifying* 540 F.2d 1062 (7th Cir. 1976), *aff'g* 398 F.Supp. 882 (N.D.Ill.1975), the court enjoined the INS from stopping and questioning an individual as to his or her immigration status in the absence of a reasonable belief on the part of the agent that *that* individual was an alien. *Pilliod* involved, among other things, area control operations conducted within a number of workplaces. In one such operation found to violate the Fourth Amendment, thirty INS agents, following up an anonymous letter that alleged that illegal aliens were employed at a manufacturing plant in Mendota, Illinois, arrived at the plant, demanded to speak to the employees (95% of whom had Spanish surnames), interviewed nineteen workers, and arrested ten. 398 F.Supp. at 890–91. The Seventh Circuit, noting that the INS "had ample time to procure a search warrant" before commencing the Mendota raid, determined that "the district court was justified in concluding that ... successive interrogations of persons in factories violated the Fourth Amendment because these persons were singled out by the INS agents solely because they looked like Mexicans or had Spanish surnames." 540 F.2d at 1070. To the same effect, see *Marquez v. Kiley,* 436 F.Supp. 100, 110–14 (S.D.N.Y.1977) (declaratory relief granted to plaintiffs who objected to INS area control operations).

It appears from the record, moreover, that the INS planned the H&H operation for an extended period of time. Given this information, it is difficult to understand why a warrant was not secured from a neutral magistrate before agents were ever deployed at the New Jersey factory. As Justice Harlan observed, albeit in another context, "under the Fourth Amendment, warrants are the *general rule,* to which the legitimate needs of law enforcement may demand specific exceptions." *Katz v. Unit-*

*ed States,* 389 U.S. 347, 362, 88 S.Ct. 507, 517, 19 L.Ed.2d 576 (1967) (concurring opinion) (emphasis added). *See Blackie's House of Beef, Inc. v. Castillo,* 659 F.2d 1211, 1217, 1223 (D.C.Cir.1981) (noting that "the applicability of the Warrant Clause of the fourth amendment to INS enforcement activities can no longer be doubted," and permitting an "area control operation" in a restaurant where INS agents *had* obtained a warrant).

Even were I to conclude, contrary to the majority, that the Fourth Amendment was violated by the INS operation at H&H—a conclusion, it should be stressed, that I do not reach—I would be constrained to dismiss these petitions for review. As is evident from the majority's recitation of the facts, the record is not silent as to events that occurred after the action at H&H Industries. The petitioners were transported from the factory premises to an INS office in Newark. At that office, according to uncontradicted testimony, each petitioner was advised, in Polish, of the rights afforded to him under 8 C.F.R. § 287.3.[3] Specifically, each petitioner was informed of his right to remain silent, of the fact that anything he said could be used against him at a deportation proceeding, and of his right to counsel. Each petitioner signed a statement, printed in Polish, waiving those rights. Five of the six petitioners then answered written questions. Each admitted to being a citizen of Poland, a holder of a tourist visa, and an employee of H&H Industries. The sixth petitioner in this case apparently did not provide the Service with similar written admissions, but his passport, which established that he was a Polish citizen who had overstayed his visa, was obtained by the INS and was introduced at his deportation hearing. Specifically, the Board of Immigration Appeals found that "[r]espondent Kowalczuk's father-in-law gave these documents to an [INS] investigator" and that "[t]here was no objection to this delivery." Record at 4.

Petitioners argue that because they were "unlawfully" apprehended at H&H, any evidence obtained from them at Newark should be suppressed as the "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963). It is an open question whether or not some variant of the exclusionary rule exists to prevent the introduction in a deportation proceeding of evidence procured in violation of the Fourth Amendment.[4] Even were this question to be resolved in the affirmative, however, it does not follow that all evidence acquired *after* a Fourth Amendment violation has occurred must be ignored—especially, where, as here, that evidence was volunteered by petitioners and is dispositive on the issue of deportability. The Supreme Court, in a recent criminal case which elaborated on *Wong Sun,* determined that, in certain instances, an otherwise valid confession could be suppressed as the fruit of an illegal arrest. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Rather than formulate a *per se* rule, though, the Court concluded that the "question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case." Relevant factors to be considered in this connec-

---

3. The relevant portion of 8 C.F.R. § 287.3 is quoted in the majority opinion at 297. As the majority points out, the regulation was amended by the INS subsequent to petitioners' arrest.

4. The Board of Immigration Appeals, in 1979, concluded, over a strong dissent, that the Fourth Amendment exclusionary rule was not applicable in deportation proceedings. *See* In re Sandoval, 17 I. & N.Dec. (BIA 1979). The federal courts have yet to resolve the matter. *Compare Wong Chung Che v. Immigration and Naturalization Service,* 565 F.2d 166, 169 (1st Cir. 1977) *with Smith v. Morris,* 442 F.Supp. 712, 714 (E.D.Pa.1977), *appeal dismissed on other grounds sub nom. Smith v. Immigration and Naturalization Service,* 585 F.2d 600 (3d Cir. 1978). *See* Note, *The Applicability of the Exclusionary Rule in Administrative Adjudicatory Proceedings,* 66 Iowa L.Rev. 343, 371–78 (1981); Note, *The Exclusionary Rule in Deportation Proceedings: A Time for Alternatives,* 14 J. Int'l L. & Econ. 349 (1980); Note, *Immigration—In re Sandoval: Deportation and the Exclusionary Rule,* 58 N.C.L.Rev. 647 (1980).

tion include: whether the defendant received *Miranda* warnings; the "temporal proximity of the arrest and the confession"; the "presence of intervening circumstances"; and "the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S.Ct. at 2261–62.

Even assuming that the principle of suppression enunciated in *Brown* is applicable in the deportation context—another question that need not be answered here—the facts in this case, in my view, do not compel suppression of petitioners' Newark statements or Kowalczuk's passport. For a number of reasons, I believe that "the causal connection between the statements and the [allegedly] illegal arrest is broken sufficiently to purge the primary taint of the [allegedly] illegal arrest," *Dunaway v. New York*, 442 U.S. 200, 204, 99 S.Ct. 2248, 2252, 60 L.Ed.2d 824 (1979). First, petitioners' Newark "confessions" and Kowalczuk's papers were secured at a time and place substantially removed from the events at H&H Industries. Second, INS officials in Newark complied in all respects with the due process and evidentiary requirements of 8 C.F.R. § 287.3. In this regard, the Board of Immigration Appeals specifically found that "each [petitioner] was given a form which advised him in Polish of his right[s]." Record at 5. The record contains these forms, signed by the petitioners. Third, while it perhaps could be argued that foreign-speaking persons, removed at night from their workplace and transported to a strange locale for questioning, can never be sufficiently free of coercion to cooperate willingly with INS officials, petitioners advance no such argument here. Indeed, they never contend that the statements they provided to investigators at the Newark office were anything other than voluntarily obtained. Moreover, the Board found that all of the petitioners' admissions—even

those given to agents at the factory itself—were "voluntarily made." Record at 7–8. Finally while INS investigators during the area control operation may have violated the Fourth Amendment, it would be difficult to hold without more that their conduct was "flagrant" or "obvious[ly]" improper, *Brown, supra*, 422 U.S. at 604, 605, 95 S.Ct. at 2262. This would seem particularly so here inasmuch as today's majority concludes that no constitutional rights of petitioners were violated whatsoever.

In sum, there is nothing in the record to indicate that what happened at H&H, "even assuming *arguendo* that it was illegal, bore a relationship to the information furnished hours later at the Service office," *In re Sandoval*, 17 I. & N.Dec. (BIA 1979) (Appleman, Board Member, concurring in part and dissenting in part). In the absence of any allegation, much less any substantiation, of undue influence on the free will of petitioners, I would not hold that the behavior of the agents at H&H Industries somehow "tainted" the information that was voluntarily obtained from petitioners in Newark.[5]

The task of a court of appeals, in reviewing a deportation order issued by the Board of Immigration Appeals, is to determine whether that order is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). In my view, the documents obtained from a relative of petitioner Kowalczuk, and the admissions made by petitioners at the Newark INS office, after they had been informed of and had freely waived their rights, constitute clear and convincing evidence of their deportability. Assuming *arguendo* that petitioners were seized at H&H in contravention of the Fourth Amendment, and assuming that any statements they made at that time should therefore be suppressed, there remains in

---

5.  *Cf. Avila-Gallegos v. Immigration and Naturalization Service*, 525 F.2d 666, 667 (2d Cir. 1975); *Huerta-Cabrera v. Immigration and Naturalization Service*, 466 F.2d 759, 761–62 (7th Cir. 1972); 1A C. Gordon & H. Rosenfield,

Immigration Law and Procedure 5–117 (rev. ed. 1981) ("impropriety in procuring evidence does not exempt the respondent from deportability, and his deportation can properly be ordered on untainted evidence").

the record sufficient untainted documentation to establish that petitioners Drzymala, Weszandize, Pilat, and Kowalczuk had overstayed their tourist visas in violation of 8 U.S.C. § 1251(a)(2), and that petitioners Babula and Lonc had engaged in unauthorized employment in violation of 8 U.S.C. § 1251(a)(9). Accordingly, I would affirm the Board's orders and deny the petitions presented for review on this appeal.